# IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF GEORGIA SAVANNAH DIVISION

**FILED**
Dana Wilson, Clerk
United States Bankruptcy Court
Savannah, Georgia
*1:21 pm, May 02 2025*

In re:

CAREY MACON,

*Debtor.*

)
)
)
)
)
)
)
)
)
)

Chapter 13

Number <u>09-41631-EJC</u>

CAREY MACON,

*Movant,*

v.

O. BYRON MEREDITH, III,
Chapter 13 Trustee,

*Respondent.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Contested Matter

## OPINION ON DEBTOR'S MOTION TO EXCLUDE MALPRACTICE CLAIM FROM THE BANKRUPTCY ESTATE

This Chapter 13 case has been pending since July 30, 2009—over fifteen years. Almost 12 years ago, on October 16, 2013, the Debtor, Carey Macon, received his discharge after completing payments under his confirmed plan. Now before the

1

Court is the Debtor's Motion for Order Excluding Civil Claim from the Estate, or, in the Alternative, Motion for Approval of Civil Claim Settlement (the "Motion to Exclude Malpractice Claim"). (Dckt. 151). That motion requires the Court to resolve a dispute between the Debtor and the Chapter 13 Trustee arising from the Debtor's legal malpractice cause of action against his former personal injury counsel. That cause of action arose in January 2024, when the Debtor's personal injury case, which arose on August 31, 2010, was administratively dismissed with prejudice by a Georgia state court due to a missed deadline. The Debtor settled the malpractice claim with his personal injury counsel's insurance carrier for $600,000.00.

The Chapter 13 Trustee does not oppose the gross settlement but instead seeks sufficient funds—about $40,306.00—to pay unsecured creditors in full. On October 11, 2024, the Debtor filed the Motion to Exclude Malpractice Claim now before the Court. After a November 13, 2024 hearing, the Court approved the gross settlement, took the motion under advisement, and directed the Debtor's bankruptcy counsel to hold in trust $41,000.00 pending resolution of this dispute.

Both parties have briefed the matter. The Trustee contends that the malpractice claim was merely a continuation of, or a substitute for, the underlying personal injury claim, which arose after confirmation of the Debtor's Chapter 13 plan and therefore was indisputably property of the estate under *Waldron v. Brown (In re Waldron)*, 536 F.3d 1239 (11th Cir. 2008). Because the 2010 personal injury

2

claim was estate property, so too is the 2024 malpractice claim, or so the Trustee would have it. For his part, the Debtor contends that none of the malpractice claim settlement proceeds belong to the estate because that claim was a separate cause of action from the personal injury claim, and because property had long ceased to accumulate in the bankruptcy estate when the malpractice claim accrued.

Having considered the matter, the Court holds that the Trustee's claim to a portion of the malpractice claim settlement funds fails, for three reasons. First, 11 U.S.C. § 1306(a) did not capture the January 2024 malpractice claim for the bankruptcy estate because the August 1, 2017 closing of this case terminated the operation of that statutory provision, and the case's June 26, 2018 reopening under 11 U.S.C. § 350(b) did not change that fact. Second, in arguing that the malpractice claim has "sufficient roots" in the personal injury claim to make it estate property, the Trustee relies on an antiquated doctrine, established in *Segal v. Rochelle*, 382 U.S. 375 (1966), that has *never* been applied to an asset acquired post-discharge and post-closure in a Chapter 13 case. And third, even if the malpractice claim did belong to the bankruptcy estate, in no event could the Trustee distribute its proceeds to creditors because plan modification is time-barred under 11 U.S.C. § 1329(a) and (c), and the Debtor has not consented to circumventing those time limitations. For these reasons, the Court will grant the Debtor's Motion to Exclude Malpractice Claim.

3

## I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A). The Court makes the following findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, made applicable to this matter by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. Findings of Fact

The facts in this case are undisputed. The Court held hearings relevant to this matter on September 11, 2024, on November 13, 2024, and on February 26, 2025. Transcripts of the first two hearings appear on the docket; the third was limited to oral argument by counsel.[1] (Dckt. 170, 172). Only one witness, Noble L. Boykin, Jr., testified, and he did so at the November 13, 2024 hearing. (11/13/2024 Tr., at pp. 34-43). No exhibits were offered or admitted into evidence. Under Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of its docket in this case. *See Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014) ("Under Rule 201 of the Federal Rules of Evidence, a court 'may take judicial notice on its own'" at any stage of a proceeding).

---

[1] These transcripts will be referenced as "9/11/2024 Tr." and "11/13/2024 Tr.," respectively.

A. <u>Commencement of Chapter 13 Case and 2010 Personal Injury Claim</u>

The Debtor, a dockworker, filed a Chapter 13 petition on July 30, 2009.[2] (Dckt. 1). In his plan, he proposed to pay the Chapter 13 Trustee $198.00 per month for a minimum of 36 months. (Dckt. 6, p. 1, paragraph 1). The $198.00 plan payment equaled the amount of his monthly net income disclosed in his Schedule J. (Dckt. 1, p. 21, ¶ 20(c)). He proposed an applicable commitment period of 36 months—the minimum permitted under the Bankruptcy Code[3]—because his income was below-median, as set forth in his Chapter 13 Statement of Currently Monthly Income and Calculation of Commitment Period and Disposable Income. (Dckt. 1, pp. 37-38).

Creditors filed claims in the case totaling $207,155.04, comprising one $167,156.08 secured claim (the Debtor's mortgage)[4] and $39,998.96 in unsecured claims (mostly medical debts).[5] The Debtor's plan provided for the general

---

[2] This case, originally assigned to Judge Lamar W. Davis, was reassigned to the undersigned on June 28, 2013. The case was again reassigned, this time to Judge Michele J. Kim, on August 1, 2017. Finally, on January 2, 2020, the case was again reassigned to the undersigned.

[3] *See* 11 U.S.C. § 1325(b)(4)(A)(i).

[4] The lone secured claim was filed by First Horizon Home Loans, a division of First Tennessee Bank National Association ("First Horizon"). (Claim No. 15-1). That claim was allowed in the amount of $167,156.08. (Dckt. 116, p. 2). First Horizon stated in its proof of claim that the Debtor was current on payments as of the petition date. (Claim No. 15-1, p. 1, ¶ 4). The Debtor's plan was silent as to the treatment of First Horizon's claim, and thus presumably his intention was to pay the mortgage directly rather than through the Chapter 13 Trustee. (Dckt. 6, p. 1, ¶ 2(d)).

[5] In his Schedule D, the Debtor listed two secured creditors: his mortgage creditor and an automobile creditor. (Dckt. 1, p. 13). The automobile was a 2001 Ford Taurus valued by the Debtor at $825.00 and subject to a $1,702.00 lien. (Dckt. 1, p. 13). Since the Debtor paid his mortgage outside the plan, and since the car was worth so little, it isn't clear why he filed under Chapter 13 instead of Chapter 7 in the first place.

unsecured creditors to receive "a zero [percent] dividend or a pro rata share of $100.00, whichever is greater." (Dckt. 6, p. 2, paragraph 2(i)). The Trustee's Motion to Confirm Plan as Amended, which the Debtor consented to, provided that the Debtor would "pay $100.00 or more to unsecured creditors, but in any event [would] pay not less than [zero percent] of the total allowed unsecured claims."[6] (Dckt. 36, p. 1). The Court confirmed the Debtor's plan on April 20, 2010.[7] (Dckt. 61).

Four months after confirmation, on August 31, 2010, the Debtor was injured by a crane while working at the Port of Savannah, giving rise to a personal injury claim against the Georgia Ports Authority (the "2010 Claim").[8] (11/13/2024 Tr., pp.

---

[6] The Court's General Order No. 2017-4 provides that "[i]n all Chapter 13 cases in which confirmation hearings are held on or after December 1, 2017, the trustee may propose changes to the plan on the revised 'Trustee's Motion To Confirm Plan As Amended' form or via a consent order, so long as the debtor, debtor's counsel (if applicable), and any creditor adversely affected by the proposed amendment have consented to the changes."

[7] The confirmation order provided that "[p]roperty of the estate revest[ed] in the Debtor upon confirmation pursuant to 11 U.S.C. [§] 1327." (Dckt. 61, p. 1, ¶ 6).

[8] The Debtor had two previous workers' compensation settlements while the bankruptcy case was pending. The first pertained to an occupational hearing loss claim prosecuted by attorney Charles H. Raley, Jr., resulting in a $9,950.00 settlement. (Dckt. 27, p. 2, ¶ 20; Dckt. 42; Dckt. 43, Dckt. 45; Dckt. 52, p. 2, ¶ 20; Dckt. 56). The second arose from an October 21, 2008 injury and was likewise prosecuted by Mr. Raley, resulting in a $72,500.00 settlement. (Dckt. 53; Dckt. 54; Dckt. 63, pp. 2-3, ¶ 21; Dckt. 67; Dckt. 68). The Chapter 13 Trustee did not attempt to claim the proceeds of those settlements for the bankruptcy estate. (11/13/2024 Tr., pp. 16-18). See In re Fullwood, 446 B.R. 634 (Bankr. S.D. Ga. 2010) (Davis, J.) (holding that workers' compensation settlements, although not listed in O.C.G.A. § 44-13-100, are exemptible in bankruptcy under O.C.G.A. § 34-9-84). In any event, the deadline for the Trustee to object to the Debtor's claimed exemptions in those workers' compensation settlements has long expired. See Fed. R. Bankr. P. 4003(b) (requiring a party in interest to object to a claimed exemption within 30 days after the later of the conclusion of the § 341 meeting, the filing of an amended Schedule C, or the filing of a supplemental Schedule C).

18, 36, 38-39). As will be discussed, the law is clear, and the parties agree, that the 2010 Claim was property of the bankruptcy estate under binding Eleventh Circuit precedent. *See Waldron v. Brown (In re Waldron)*, 536 F.3d 1239 (11th Cir. 2008). The Debtor disclosed the 2010 Claim to the Court on March 29, 2011, when he applied to employ attorneys R. Scot Kraeuter and Elizabeth Costner as special counsel to prosecute it.[9] (Dckt. 72, 73, 74). On April 13, 2011, the Court granted that application. (Dckt. 79, 80). A few months later, on August 8, 2011, Kraeuter and Costner moved to withdraw as special counsel, and on August 22, 2011, the Court entered an order permitting them to do so. (Dckt. 85, 86). Almost eleven months after that, on July 13, 2012, the Debtor applied to employ Ralph R. Lorberbaum as special counsel to prosecute the 2010 Claim, and six days later the Court granted that application. (Dckt. 97, 99).

Then, on July 8, 2013, the Debtor for the first time amended his Schedule B to list the 2010 Claim, identifying Lorberbaum as counsel and stating that the claim's value was contingent and unknown.[10] (Dckt. 102, pp. 2-3, ¶ 21). In that amendment,

---

[9] In that application, the Debtor described the 2010 Claim as a workers' compensation claim. (Dckt. 72, p. 1, ¶¶ 3-4). But the Debtor now takes the position, which the Trustee does not dispute, that the 2010 Claim was, in fact, a personal injury claim. (9/11/2024 Tr., p. 2; 11/13/2024 Tr., p. 18).

[10] As in the March 29, 2011 motion to employ Kraeuter and Costner, the Debtor again identified the 2010 Claim as a workers' compensation claim, stating "[w]orker's compensation claim[,] Ralph Lorberbaum representing debtor[,] value contingent and unknown." (Dckt. 102, p. 3).

the Debtor also disclosed his employment of attorney Noble L. Boykin, Jr.[11] (Dckt. 102, p. 3). On that same day, July 8, 2013, the Debtor moved to employ Mr. Boykin as special counsel to prosecute the 2010 Claim.[12] (Dckt. 103, 104). On July 15, 2013, the Court granted the Debtor's application to employ Mr. Boykin. (Dckt. 107).

B. The Debtor's Completion of Plan Payments and Case Closing

In the face of this newly discovered asset, the Trustee did not seek to modify the Debtor's plan under § 1329 to capture any part of the asset for the benefit of unsecured creditors. Instead, on September 9, 2013, the Trustee initiated the closing of this case when he filed a notice stating that the Debtor had completed all payments required under the confirmed plan. (Dckt. 109). In that notice, the Trustee stated as follows:

> Dear Sir/Madam,
>
> Our records indicate that you have paid sufficient funds to complete your case. The final disbursement has been mailed to your creditors. To close your case, we are notifying the Clerk of the Bankruptcy Court that you have completed the payments required by your plan.
>
> In order for the court to close your case, you must complete and submit the enclosed certificate regarding

---

[11] Confusingly, the Debtor made this disclosure by listing, in addition to the "workers' compensation" claim prosecuted by Lorberbaum, a "Claim v. Georgia Ports," also contingent and of unknown value, prosecuted by Mr. Boykin. (Dckt. 102, p. 3). These appear to be the same claim.

[12] In his initial application to employ Mr. Boykin, the Debtor stated that Mr. Boykin would represent him in an unspecified "personal injury" claim. (Dckt. 103). The Debtor filed an amended application that same day to disclose that the claim arose "from injuries occurring on August 31, 2010," i.e. the 2010 Claim. (Dckt. 104, p. 1, ¶ 2).

> Domestic Support obligations within ten (10) days of the date of this letter . . . .
>
> A release of wages has been issued to your employer (if applicable). This order directs your employer to stop deducting from your pay. Upon completion of our final audit, we will mail you a check (if you are due a refund) for all excess funds on hand at this time. Please cash the check as soon as possible.
>
> After all disbursement checks issued in your case have cleared our account, we will submit our final report and accounting to the Court showing the total funds received and disbursed on your behalf with copies to you and your attorney. This closing process may take as much as 180 days.

(Dckt. 109). Three days later, on September 12, 2013, the Debtor filed his domestic support obligation ("DSO") certificate, as well as his financial management course certificate, both prerequisites for obtaining a discharge under §§ 1328(a) and 1328(g), respectively. (Dckt. 110, 111). The next day, the Clerk entered a notice giving parties 30 days to object to entry of discharge. (Dckt. 112). No objections were filed, and on October 16, 2013, the Court entered an order granting the Debtor a discharge under 11 U.S.C. § 1328(a). (Dckt. 114).

A month later, on November 25, 2013, the Trustee filed a final report and account under Bankruptcy Rule 5009(a)[13] summarizing receipts from the Debtor,

---

[13] Bankruptcy Rule 5009(a) provides that "[t]he estate in a Chapter 7, 12, or 13 case is presumed to have been fully administered when: (1) the trustee has filed a final report and final account and has certified that the estate has been fully administered; and (2) within 30 days after the filing, no objection to the report has been filed by the United States trustee or a party in interest." Fed R. Bankr. P. 5009(a).

expenses of administration, and disbursements to creditors. (Dckt. 116). Pertinent to the dispute now before the Court, the Trustee stated that general unsecured creditors, whose claims totaled $39,998.96, received $3,723.90 from the Debtor's plan payments—considerably more than the $100.00 the Debtor initially proposed to pay. (Dckt. 116, p. 3). In the report's conclusion, the Trustee stated as follows:

> The trustee certifies that, pursuant to Federal Rule of Bankruptcy Procedure 5009, the estate has been fully administered, the foregoing summary is true and complete, and all administrative matters for which the trustee is responsible have been completed. The trustee requests a final decree be entered that discharges the trustee and grants such other relief as may be just and proper.

(Dckt. 116, p. 3, ¶ 12). No party in interest objected to the Trustee's final report and account. Despite the Trustee's request, however, the Clerk did not immediately enter a final decree. After the Trustee filed his final report and account, no docket entries were made for seven months. Then, on June 26, 2014, the Clerk entered a note in the Court's private docket stating that the case was not to be closed due to the pending 2010 Claim. (11/13/2024 Tr., p. 9).

On December 18, 2014—over a year after the Debtor received his discharge— he sustained a *second* injury at the Port of Savannah when a vehicle ran over a piece of sheet metal he was standing on, "causing the sheet metal to flip up under [the Debtor's] foot and causing him to be jolted and, in turn, causing injury to his back, left hip[,] and left knee." (Dckt. 133, p. 1; 9/11/2024 Tr., p. 7). That accident gave

10

rise to a second personal injury claim against the Georgia Ports Authority (the "2014 Claim"), and the Debtor hired Mr. Boykin to prosecute that claim in addition to the 2010 Claim. (9/11/2024 Tr., pp. 2-3, 7).

Three years after the discharge was entered, on August 1, 2017, the Clerk entered a final decree stating that the case was fully administered, discharging the Trustee,[14] and closing the case. (Dckt. 117). The Court is unable to determine why the case was closed at that time. No party in interest requested closure, and the 2010 Claim remained pending. (11/13/2024 Tr., pp. 8-9). Whatever the reason, the case was closed.[15]

## C. The Reopening of the Case

Nine months after the case was closed, on May 8, 2018, the Debtor moved to reopen the case under 11 U.S.C. § 350(b) "for the limited purpose of scheduling a

---

[14] When the case was later reopened, the Trustee was not reappointed. Bankruptcy Rule 5010, however, requires reappointment before a trustee may administer assets; it states that "[o]n the debtor's or another party in interest's motion, the court may, under § 350(b), reopen a case. In a reopened Chapter 7, 12, or 13 case, the United States trustee must not appoint a trustee unless the court determines that one is needed to protect the interests of the creditors and the debtor, or to ensure that the reopened case is efficiently administered." Fed. R. Bankr. P. 5010. Here, the United States Trustee has not moved to reappoint the Chapter 13 Trustee. And although the Debtor's motion to reopen, and the order granting that motion, contemplated that personal injury settlement proceeds would be submitted to the Trustee, it did not provide for the Trustee's reappointment. Arguably, then, the Court could decide this case against the Trustee on this ground alone. *See In re D'Antignac*, No. 05–10620, 2013 WL 1084214, at *6 (Bankr. S.D. Ga. Feb. 19, 2013) (Barrett, C.J.) ("In the current case, there is no [C]hapter 13 trustee."). But the Court will not do so.

[15] Perhaps a better question is why the case remained open for almost four years after the Trustee filed his final report and account. Under the Court's internal standard operating procedures, the filling of the Trustee's final report and account under Bankruptcy Rule 5009(a) (and the expiration of the 30-day objection deadline) ordinarily triggers the closing of the case.

11

claim for personal injuries arising from an accident in 2010[16] and an additional claim for personal injuries arising from a work accident on December 18, 2014." (Dckt. 118, p. 1, ¶ 4). Contemporaneously with that motion, the Debtor amended his Schedule A/B to disclose the 2014 Claim. (Dckt. 119, pp. 5-6, ¶ 34). The Debtor described that claim as contingent and of unknown value, and he disclosed that Mr. Boykin was prosecuting it. (Dckt. 119, pp. 5-6, ¶ 34).

At a June 22, 2018 hearing on the motion to reopen, Debtor's counsel represented that he sought reopening to disclose the 2014 Claim to prevent that claim from being dismissed in state court on grounds of judicial estoppel.[17] Mr. Boykin appeared at that hearing and stated that he represented the Debtor in both the 2010

---

[16] In fact, the Debtor had already disclosed the 2010 Claim in his July 8, 2013 amendment to Schedule B.

[17] Judicial estoppel applies where "the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017). The doctrine is intended to "prevent the perversion of the judicial process and protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (citations omitted). Often, judicial estoppel is invoked as a defense in state court or federal district court because the plaintiff in that suit was a debtor in bankruptcy and failed to disclose the claim to the bankruptcy court. In those circumstances, judicial estoppel is not an issue for the bankruptcy court to decide. *See D'Antignac*, 2013 WL 1084214, at *4 (quoting *Matter of Dewberry*, 266 B.R. 916, 920 (Bankr. S.D. Ga. 2001) (Davis, J.) ("It seems self-evident that if the principle is invoked to protect the integrity of the judiciary, then it must be invoked in the [c]ourt in which the apparent self-serving contradiction occurred and in which the defense is first asserted."). Here, the Debtor evidently feared that his pursuit of the 2014 Claim in state court could have been thwarted by judicial estoppel. But since the 2014 Claim arose after he completed his Chapter 13 plan and received his discharge—and by the Trustee's admission was not property of the bankruptcy estate—it isn't entirely clear that the claim would have been susceptible to a judicial estoppel defense, or that this bankruptcy case needed to be reopened to disclose it.

12

Claim and the 2014 Claim. On June 26, 2018, the Court entered a consent order

reopening the case. (Dckt. 123). That order stated in relevant part as follows:

> IT IS HEREBY ORDERED that the foregoing case is
> reopened for the limited purpose of listing additional
> claims arising out of an accident occurring in 2010 and an
> additional claim for personal injuries arising from a work
> accident on December 18, 2014.
>
> . . .
>
> The case shall remain open until the claims are resolved.
> Any settlement shall be approved by the Court, and *any
> non-exempt proceeds shall be submitted to the Chapter 13
> Trustee for the benefit of unsecured creditors.*

(Dckt. 123, p. 1) (emphasis added). Both counsel for the Chapter 13 Trustee and

Debtor's counsel signed that consent order. (Dckt. 123, p. 2). Once the case was

reopened, the Debtor moved on June 29, 2018, to have the Court approve Mr.

Boykin's employment as special counsel to prosecute the 2014 Claim, and the Court

granted that application that same day. (Dckt. 125, 127).

D. The Settlement of the 2014 Claim

Mr. Boykin timely filed suit against the Georgia Ports Authority as to the 2010

Claim and presumably as to the 2014 Claim, as well.[18] (11/13/2024 Tr., pp. 15, 36).

In the personal injury case arising from the 2010 Claim, depositions were taken, and

the Debtor's medical records were provided to defense counsel. (11/13/2024 Tr., p.

---

[18] Mr. Boykin settled the 2014 Claim in 2024, so it appears the case had been litigated for some years.

37). Mr. Boykin intended to mediate both the 2010 Claim and the 2014 Claim at the same time, but, per Mr. Boykin, the Georgia Ports Authority "indicated their adjuster was not prepared to mediate" the 2010 Claim, only the 2014 Claim. (11/13/2024 Tr., p. 36). The parties ultimately settled the 2014 Claim and, on May 28, 2024, the Debtor moved for approval of the $140,000.00 settlement. (Dckt. 131, amended at Dckt. 133; 9/11/2024 Tr., pp. 8-9). Of the $140,000.00 gross settlement, the Debtor was to receive net proceeds of $60,842.17. (Dckt. 133, p. 4; 9/11/2024 Tr., p. 9).

The Debtor's motion to settle the 2014 Claim was scheduled for hearing on September 11, 2024. (Dckt. 134, 145). In attendance at that hearing were Debtor's bankruptcy counsel, counsel for the Chapter 13 Trustee, and Mr. Boykin. Debtor's counsel and the Trustee's counsel agreed that the 2014 Claim was *not* property of the bankruptcy estate.[19] (9/11/2024 Tr., pp. 5-6, 12). When questioned by the Court, the Debtor stated that he was satisfied with the $140,000.00 gross settlement of the 2014 Claim, and the Court approved the settlement. (9/11/2024 Tr., p. 11). The Court later entered a written order approving the settlement. (Dckt. 149).

---

[19] At the September 11, 2024 hearing, the Court noted that the 2014 Claim arose post-discharge, and counsel for the Chapter 13 Trustee stated, "we have no heartburn as to this motion" and "[w]e're not asking for any funds." (9/11/2024 Tr., p. 6). Later in the hearing, the Court asked the Trustee's counsel to reaffirm that the Trustee "is not claiming any part of [the 2014 Claim settlement proceeds] for the benefit of creditors in this case," and counsel stated, "[c]orrect." (9/11/2024 Tr., p. 12).

E. The Malpractice Claim

The issue presented by this case was first revealed by the Debtor's July 12, 2024 amendment to his Schedule A/B disclosing a claim, which the Debtor described as contingent and of unknown value, against Mr. Boykin for legal malpractice (the "Malpractice Claim").[20] (Dckt. 143, p. 5, ¶ 33). A discussion of that claim ensued at the September 11, 2024 hearing on the 2014 Claim settlement. At that hearing, Mr. Boykin explained to the Court that the 2010 Claim was administratively dismissed by operation of Georgia law, which requires automatic dismissal of a case in which no order is entered within five years.[21] (11/13/2024 Tr., pp. 15-16). The parties agree that the Debtor's 2010 Claim against the Georgia Ports Authority expired, with no possibility of revival, sometime in January 2024 and that the Malpractice Claim against Mr. Boykin accrued at that time.[22]

---

[20] In the amended Schedule A/B filed on July 12, 2024, the Debtor stated that he had a "potential" claim against Mr. Boykin. (Dckt. 143, p. 5, ¶ 33). On August 27, 2024, the Debtor again amended his Schedule A/B to delete the word "potential." (Dckt. 147, p. 5, ¶ 33).

[21] See O.C.G.A. § 9-2-60(b) ("Any action or other proceeding filed in any of the courts of this state in which no written order is taken for a period of five years shall automatically stand dismissed with costs to be taxed against the party plaintiff."). The statute permits revival "if the plaintiff recommences the action within six months following the dismissal," but "the renewed action shall stand upon the same footing, as to limitation, with the original action." O.C.G.A. § 9-2-60(c).

[22] The exact date the Malpractice Claim arose is not entirely clear. In his Motion to Exclude Malpractice Claim, Debtor's counsel stated that the 2010 Claim "expired on Friday, January 12th, 2024" and that "[o]n January 13th, 2024 a new claim arose . . . for errors or omissions[.]" (Dckt. 151, p. 1, ¶¶ 5-6; 11/13/2024 Tr., pp. 18-19). Mr. Boykin testified that the 2010 Claim became "dormant" in January 2024. (11/13/2024 Tr., p. 35). Counsel for the Chapter 13 Trustee suggested that the Malpractice Claim arose on January 4, 2024. (11/13/2024 Tr., p. 42). The Court interprets the parties' representations to mean that by sometime in January 2024, the 2010 Claim no longer had any possibility of revival.

Mr. Boykin candidly admitted that he calendared the five-year deadline in the wrong file, allowing five years to elapse without an order and causing the 2010 Claim to be dismissed. (9/11/2024 Tr., p. 3; 11/13/2024 Tr., pp. 15-16, 35). He said he disclosed that mistake to the Debtor, and to his Errors and Omissions ("E&O") insurance carrier. (9/11/2024 Tr., p. 3; 11/13/2024 Tr., pp. 14, 42). He stated at the September 11, 2024 hearing that the Debtor, proceeding *pro se*, had reached a confidential settlement with the E&O carrier that would be brought before the Court at later date.[23] (9/11/2024 Tr., pp. 3-4, 6, 9-10).

F. The Debtor's Motion to Exclude the Malpractice Claim from the Estate

On October 11, 2024, the Debtor filed the Motion to Exclude Malpractice Claim that is now before the Court. (Dckt. 151). In that motion, the Debtor argues that the Malpractice Claim against Mr. Boykin arose on January 13, 2024, which was "10 years, 2 months, [and] 28 days" after the Debtor received his discharge in this Chapter 13 bankruptcy case. (Dckt. 151, pp. 1-2, ¶¶ 6-7). Because the Malpractice Claim arose so long after the discharge, the Debtor argued that it was not property of the bankruptcy estate. (Dckt. 151, p. 2, ¶ 8). He requested an order "adjudging [that] the [Malpractice Claim] is not property of the estate" or, in the alternative, "an order approving the settlement" and directing the disbursement of

---

[23] At the September 11, 2024 hearing, the Debtor suggested that Lorberbaum was representing him in the Malpractice Claim. (9/11/2024 Tr., pp. 11-12). But that is not otherwise apparent from the record.

"funds sufficient to pay allowed claims in full." (Dckt. 151, p. 2). The Chapter 13 Trustee filed a response in opposition, arguing that the Malpractice Claim "is property of the bankruptcy estate" because it "arose, same as the underlying personal injury claim [i.e. the 2010 Claim], during the pendency of the bankruptcy case." (Dckt. 154, p. 3, ¶¶ 16, 17).

The Motion to Exclude Malpractice Claim came on for hearing on November 13, 2024. (Dckt. 152). At that hearing, Mr. Boykin explained that the Malpractice Claim had been settled but that his E&O carrier requested that the amount of that settlement remain confidential. (11/13/2024 Tr., pp. 22-24, 25-26, 28, 34-35). The Court took testimony from Mr. Boykin regarding the 2010 Claim's dismissal under Georgia's five-year rule, and at the Court's insistence Mr. Boykin stated on the record that the Malpractice Claim settlement amount was $600,000.00. (11/13/2024 Tr., p. 40). Counsel for the Chapter 13 Trustee stated that only $40,306.00 would be required to pay unsecured claims in full. (11/13/2024 Tr., p. 27). The parties therefore agreed that the Court could approve the $600,000.00 gross settlement and direct Debtor's counsel to hold in trust sufficient funds to pay a 100% dividend on unsecured claims pending the Court's determination of whether the Malpractice Claim was property of the bankruptcy estate (and thus whether creditors would be entitled to any settlement proceeds). (11/13/2024 Tr., pp. 24-27, 29-31). The Debtor

stated that he was satisfied with the gross settlement of the Malpractice Claim. (11/13/2024 Tr., pp. 28-29).

Consistent with the procedure discussed at the hearing, on December 2, 2024, the Court entered an interim order approving the settlement of the Malpractice Claim. (Dckt. 159). That order, which both Debtor's counsel and counsel for the Trustee signed, recited that "the amount of the settlement proceeds of the [Malpractice] Claim are in excess of the amount necessary to pay a dividend in the Debtor's bankruptcy at 100% to unsecured creditors with allowed claims[.]"[24] (Dckt. 159, p. 2). The order then set forth the following procedure:

> 1) Forty-One thousand ($41,000.00) dollars shall be remitted to [Debtor's counsel] John E. Pytte, P.C. to be held in Trust pending further order of the Court;
>
> 2) The balance of the settlement proceeds shall be issued to Debtor Carey Macon;
>
> 3) If the Debtor intends to pursue the remainder of the settlement proceeds held in trust, Debtor's counsel will contact the Court[room] Deputy by email, with a copy to the Trustee, within thirty (30) days of the date of entry of this Order, requesting a hearing on the remaining issue regarding whether the [Malpractice Claim] is property of the bankruptcy estate;
>
> 4) Should the Debtor decide not to pursue the remaining settlement proceed[s] held in trust and wish to have the bankruptcy case paid at 100% dividend, the parties may submit a Consent Order for disbursement of the settlement

---

[24] Confusingly, the interim order refers to the Malpractice Claim interchangeably as the "Civil Claim" and the "Civil Action." (Dckt. 159, pp. 1-2).

> proceeds from Mr. Pytte's trust account in the amount of
> Forty-One Thousand ($41,000.00) dollars to the Trustee
> for disbursement pursuant to Debtor's confirmed
> bankruptcy plan.

(Dckt. 159, pp. 2-3). Because the interim order was entered on December 2, 2024,

by its terms the Debtor had until January 2, 2025, to contact the Courtroom Deputy

to request a hearing. When that deadline came and went, the Court *sua sponte*

scheduled a February 26, 2025 continued hearing on the Motion to Exclude

Malpractice Claim. (Dckt. 161). Through counsel, the Debtor then communicated to

the Clerk his intention to pursue the $41,000.00 held in counsel's trust account rather

than to settle with the Trustee. Before the continued hearing took place, both the

Debtor and the Chapter 13 Trustee briefed the matter. (Dckt. 164, 167). At the

continued hearing, the Court heard oral argument from the parties and took under

advisement the Motion to Exclude Malpractice Claim.

## III. Conclusions of Law

As can be gleaned from the foregoing, the procedural posture of this case is

complex and unusual in that it has spanned, so far, over fifteen years. Unraveling the

dispute between the Debtor and the Trustee will require a close look at several

aspects of Chapter 13 of the Bankruptcy Code. In essence, Chapter 13 is a bargain

between a debtor and his creditors. On one hand, the debtor "must propose a plan to

use future income to repay a portion (or in the rare case all) of his debts over the next

three to five years." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 498 (2015). On the

19

other, he can retain his property, and, "[i]f the bankruptcy court confirms the plan and the debtor successfully carries it out, he receives a discharge of his debts[.]" *Id.* The discharge gives the debtor a "fresh start." *Harris v. Viegelahn*, 575 U.S. 510, 513 (2015).

Two key aspects of Chapter 13 warrant special emphasis. The first is that the debtor must commit his income to fund the plan. "Payments under a Chapter 13 plan are usually made from a debtor's 'future earnings or other future income.'" *Id.* (quoting 11 U.S.C. § 1322(a)(1)). Specifically, the Bankruptcy Code obligates the debtor to provide in his plan that "all of [his] projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors[.]"[25] 11 U.S.C. § 1325(b)(1)(B). Chapter 13 also permits "the payment of all or part of a claim against the debtor from property of the estate or property of the debtor[.]" 11 U.S.C. § 1322(b)(8).[26]

The second is that the Bankruptcy Code imposes on a debtor's Chapter 13 plan certain temporal limitations, referred to as the applicable commitment period.

---

[25] "Disposable income" is a defined term in the Bankruptcy Code. *See* 11 U.S.C. § 1325(b)(2). But "projected disposable income" is not. *Hamilton v. Lanning*, 560 U.S. 505, 509 (2010). The Supreme Court has held that "when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation[.]" *Id.* at 524.

[26] In the typical case, § 1322(b)(8) means that "a plan may propose funding, in whole or in part, from the liquidation of assets that are property of the debtor or of the estate," such as the sale of a car. Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel, & Adam M. Goodman, *Chapter 13 Practice & Procedure* § 4:3 (June 2024 ed.). Many courts read this provision as permitting "the use of loans to fund a plan[.]" *Id.* at § 4:5.

Whether the applicable commitment period lasts for three or five years depends on whether the debtor's income is below-median or above-median. 11 U.S.C. § 1325(b)(4). In either case, the maximum duration of a Chapter 13 plan is five years.[27] *See* 11 U.S.C. § 1322(d)(1)-(2) (providing that an above-median debtor's plan "may not provide for payments over a period that is longer than 5 years," and "the court may not approve," for a below-median debtor, "a period that is longer than 5 years"); *Whaley v. Tennyson (In re Tennyson)*, 611 F.3d 873, 878 (11th Cir. 2010) ("Section 1322(d) . . . sets the absolute maximum time period of a Chapter 13 bankruptcy plan for an above[-]median income debtor at five years, no exceptions.").

Here, the Debtor committed his disposable income of $198.00 per month to his plan. The Court confirmed his plan, making it binding on the Debtor and on all creditors. *See* 11 U.S.C. § 1327(a). And, over a 47-month period, the Debtor made all required plan payments.[28] To be sure, his plan did not provide for the payment of his unsecured creditors in full—it was not required to.[29] At issue now is whether the

---

[27] *Chapter 13 Practice & Procedure* § 4:9 ("[N]o plan may provide for payments in excess of five years.").

[28] As will be discussed, the Debtor fell behind on payments a handful of times, and the Trustee consented to extend the plan term to allow the Debtor to pay his plan as proposed.

[29] Plan payments are a function of two variables: the debtor's disposable income and the amount due to creditors under the "best interest of creditors" test of § 1325(a)(4). That Code section requires, as a condition of plan confirmation, that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]" 11 U.S.C. § 1325(a)(4). In other words, "the test sets forth a minimum amount that a debtor must pay to unsecured creditors." *Chapter 13 Practice &*

21

Debtor must give his unsecured creditors a 100% dividend by turning over to the Trustee a portion of the settlement proceeds of his Malpractice Claim. The first question this dispute poses, then, is whether those proceeds are property of the bankruptcy estate such that creditors are entitled to share in them.

A. Courts Struggle to Reconcile §§ 1306(a) and 1327(b) of the Bankruptcy Code

The commencement of a bankruptcy case "creates an estate" that includes "virtually all the debtor's assets." 11 U.S.C. § 541(a); *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 214 (2024). Specifically, under § 541(a)(1) of the Bankruptcy Code, the bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(a)(1)'s scope is "broad" and includes causes of action. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983); *Estate of Arlene Townsend v. Berman (In re Fundamental Long Term Care, Inc.)*, 81 F.4th 1264, 1284 (11th Cir. 2023). Although federal law determines whether a debtor's property interest is property of the bankruptcy estate under § 541, whether the debtor has a property interest in the first instance depends on state law. *Title Max v. Northington (In re Northington)*, 876 F.3d 1302, 1310-11 (11th Cir. 2017). *See also Butner v. United States*, 440 U.S. 48, 54-55 (1979) ("Property interests are created and defined by state law," and

---

*Procedure* § 7:6. Here, the unsecured creditors evidently would have received nothing, or almost nothing, in a Chapter 7 liquidation, hence the Debtor's promise to pay them a zero percent dividend or a pro-rata share of $100.00.

"Congress has generally left the determination of property rights in the assets of a [debtor's] estate to state law.").[30]

In a Chapter 7 case, § 541 alone governs which property interests of the debtor become property of the bankruptcy estate, and that analysis is generally straightforward. With certain statutory exceptions,[31] "a Chapter 7 estate does not include . . . the assets [a debtor] acquires *after* the bankruptcy filing." *Viegelahn*, 575 U.S. at 513-14 (emphasis in original). *See also Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234, 1237 (11th Cir. 2006) (under § 541(a)(1), "property of the [bankruptcy] estate is property the debtor had when the bankruptcy case commence[d], not property he acquires thereafter").

Chapter 13, however, is more complicated. In a Chapter 13 case, § 1306(a) provides that "[p]roperty of the estate includes, in addition to the property specified

---

[30] The Supreme Court in *Butner* acknowledged that, notwithstanding state law property rights, "some federal interest [might] require[] a different result[.]" *Butner*, 440 U.S. at 55. *See also Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law.").

[31] By its terms, § 541(a) provides that certain after-acquired property *does* become property of the bankruptcy estate. Under § 541(a)(5), the estate includes "[a]ny interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—(A) by bequest, devise, or inheritance; (B) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or (C) as a beneficiary of a life insurance policy or of a death benefit plan." 11 U.S.C. § 541(a)(5). Under § 541(a)(6), it includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). And under § 541(a)(7), it includes "[a]ny interest in property that the *estate* acquires after the commencement of the case." 11 U.S.C. § 541(a)(7) (emphasis added).

in section 541 . . . (1) all property of the kind specified in [§ 541] that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted . . . whichever occurs first[.]" 11 U.S.C. § 1306(a)(1).[32] This provision thus expands the bankruptcy estate's scope in Chapter 13 cases beyond what § 541(a) specifies, such that "the Chapter 13 estate from which creditors may be paid includes both the debtor's property at the time of his bankruptcy petition, and any . . . property acquired after filing." *Viegelahn*, 575 U.S. at 514.[33]

To receive a discharge, as mentioned, a Chapter 13 debtor must propose and obtain court confirmation of a plan committing his future income to repaying his debts. *Bullard*, 575 U.S. at 498. "A proposed bankruptcy plan becomes effective upon confirmation[.]" *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 264 (2010). And the Bankruptcy Code provides in § 1327(b) that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1327(b).[34]

---

[32] Under § 1306(a)(2), the same rule applies to a debtor's post-petition earnings. 11 U.S.C. § 1306(a)(2).

[33] Property acquired post-petition, but before confirmation, if disclosed, should be captured under the liquidation test for confirming the plan. *See* 11 U.S.C. § 1325(a)(4).

[34] Note that § 1327(b) is merely a default rule and that the plan or confirmation order may provide otherwise. Similarly, under § 1322(b)(9), a Chapter 13 plan *may* "provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity[.]" 11 U.S.C. § 1322(b)(9).

24

The Code nowhere defines what it means for property to "vest."[35] *See* 11 U.S.C. § 101. At minimum, it must mean something more than mere possession, since § 1306(b) already permits a Chapter 13 debtor to "remain in possession of all property of the estate" from the case's commencement. 11 U.S.C. § 1306(b).[36]

Courts and commentators alike have pointed out the tension between § 1306(a) and § 1327(b). Why, for instance, does § 1306(a) not list confirmation as an event upon which property acquired by the debtor ceases to become property of the estate?[37] After all, by vesting all estate property in the debtor upon confirmation, § 1327(b) suggests that the bankruptcy estate terminates at that point, or at least that property ceases to accumulate in the estate under § 1306(a). But on the other hand,

---

[35] But "[i]n both §§ 1141(b) and 349(b)(3), 'vesting' connotes a transfer of title and the termination of an estate." *In re Baker*, 620 B.R. 655, 663-64 (Bankr. D. Colo. 2020).

[36] Some courts interpret the term "vest" to mean the transfer of "absolute ownership and control of the property." *Sender v. Golden (In re Golden)*, 528 B.R. 803, 806-07 (Bankr. D. Colo. 2015); *In re Clouse*, 446 B.R. 690, 699 (Bankr. E.D. Pa. 2010); *Fritz Fire Prot. Co., Inc. v. Wei-Fung Chang (In re Wei-Fung Chang)*, 438 B.R. 77, 80-81 (Bankr. M.D. Pa. 2010). *See also In re Boyd*, 618 B.R. 133 (Bankr. D.S.C. 2020) ("While 'vesting' is not defined in the Code, the plain meaning of the term suggests a transfer of ownership or title[.]"); *In re Zisumbo*, 519 B.R. 851, 857-58 (Bankr. D. Utah 2014) ("The ordinary meaning of 'vest' is 'to confer ownership (of property) upon a person' or 'to invest (a person) with the full title to property.'"). Others interpret it to mean "something less than the transfer of full title," such as "an immediate, fixed right of present or future enjoyment[.]" *In re Gonzales*, 587 B.R. 363, 368 (Bankr. D.N.M. 2018) (quoting *In re Tarby*, No. 11–32886/JHW, 2012 WL 1390201, at *3 (Bankr. D.N.J. Apr. 20, 2012)). Perhaps, as one commentator has suggested, "[i]t . . . would have been better if Congress had stayed away from the word 'vest.'" David Gray Carlson, *The Chapter 13 Estate and its Discontents*, 17 Am. Bankr. Inst. L. Rev. 233, 236 (Winter 2009). "Courts, like first year property students, have been so confused by this word that they have, in their desperation, resorted to *Black's Law Dictionary* to figure out what it means, usually with unfortunate results." *Id.*

[37] Amir Shachmurove, *A Once and Future Muddle: The Ever-Uncertain Relationship between §§ 1306(a) and 1327(b)*, 38-DEC Am. Bankr. Inst. J. 20 (2019).

§ 1306(a) could be understood to mean that the estate continues until the case is closed, dismissed, or converted, implying that property acquired by the debtor post-confirmation continues to become estate property. Read in isolation, each of these Code sections is straightforward, but courts have struggled to harmonize them.[38] No fewer than five approaches have been developed.[39] Which approach a court chooses matters a great deal when a debtor acquires property post-confirmation, as occurred here when the Debtor suffered the post-confirmation injury giving rise to the 2010 Claim.[40]

B. Under Binding Eleventh Circuit Precedent, the 2010 Claim was Estate Property

The Eleventh Circuit has conclusively reconciled § 1306(a) and § 1327(b) in this jurisdiction, but it took a circuitous route to get there, and many questions remain unanswered. The issue first reached the Eleventh Circuit in *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333 (11th Cir. 2000). There, the Chapter 13 debtor attained

---

[38] *See In re Larzelere*, 633 B.R. 677, 680 (Bankr. D.N.J. 2021) ("What then, if anything, is property of the estate in a chapter 13 case after confirmation? Several theories abound[.]"); *In re Scholl*, 605 B.R. 163, 173 (Bankr. S.D. Ohio 2019) ("As several courts have suggested these provisions 'are difficult to reconcile,' and may even be 'impossible to reconcile.'"); *In re Wilson*, 555 B.R. 547, 550-51 (Bankr. W.D. La. 2016) ("Section 1327 is 'facially inconsistent' with § 1306); *Clouse*, 446 B.R. at 699 ("Standing alone, the language of both [§§] 1306(a) and 1327(b) is simple and unambiguous, but reconciling the interplay of the two sections is difficult.").

[39] *See Baker*, 620 B.R. at 663-64; *In re Elassal*, 654 B.R. 434, 438-40 (Bankr. E.D. Mich. 2023); *In re Marsh*, 647 B.R. 725, 730-34 (Bankr. W.D. Mo. 2023). *See also Chapter 13 Practice & Procedure* § 10:12.

[40] *See Marsh*, 647 B.R. at 730 ("[R]econciliation of § 1306 and § 1327 may determine the scope of a debtor's entitlement to retain post-confirmation property.").

26

confirmation of his plan but eventually fell behind on his mortgage payments made outside the plan. The mortgage creditor thrice moved for stay relief under § 362(d) and "assessed attorney's fees incurred with these motions against the [debtor's] account, which created a delinquency" after the debtor completed his Chapter 13 case. *Id.* at 1336. In response, the debtor filed an adversary proceeding asserting, among other things, that the mortgage creditor violated the automatic stay of § 362(a) by diverting payments to recover attorney's fees. The debtor's argument relied on the premise that the funds used to pay his mortgage were property of the bankruptcy estate. *Id.* at 1339. The bankruptcy court granted the mortgage creditor's motion for summary judgment, and the district court affirmed.

On appeal, the Eleventh Circuit panel rejected the debtor's contention that his mortgage payments were estate property. In doing so, the court noted the apparent conflict between § 1306(a) and § 1327(b): "Read together, these two provisions create a tension to the extent they govern the debtor's post-confirmation earnings: [§] 362 appears to protect those earnings while [§] 1327(b) would vest those same earnings in the debtor, thereby divesting them of the protection of section 362(a)." *Id.* at 1340. And the court discussed—and rejected—two possible approaches to reconciling those provisions. First, under the "estate termination" approach, "all property of the estate becomes property of the debtor upon confirmation and ceases

27

to be property of the estate."[41] *Id.* Second, under the "estate preservation" approach, "all property of the estate remains property of the estate after confirmation until discharge, dismissal, or conversion."[42] *Id.*

Rejecting both "extremes," the Eleventh Circuit instead adopted the "estate transformation approach, which regards only that property necessary for the execution of the plan as remaining property of the estate after confirmation." *Id.* In other words, "while the filing of the petition for bankruptcy places all the property of the debtor in the control of the bankruptcy court, the plan upon confirmation returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan[.]" *Id.* (quoting *Black v. United States Postal Service (Matter of Heath)*, 115 F.3d 521, 524 (7th Cir. 1997)). Because the debtor in *Telfair* paid his mortgage creditor outside the plan, the court held, the mortgage payments were not necessary to fulfill the plan. The payments thus ceased to be property of the

---

[41] The estate termination approach "puts heavy emphasis on § 1327(b)" but arguably "completely ignores § 1306(a), which plainly extinguishes the bankruptcy estate upon a [C]hapter 13's closing, dismissal or conversion, but does not mention confirmation at all." Charissa Potts, *The State of the Chapter 13 Estate: Miseducation of §§ 1306 and 1327*, 38-OCT Am. Bankr. Inst. J. 32, 33 (October 2019). On the other hand, one bankruptcy court has eloquently suggested that "the estate termination approach . . . respects the plain meaning of the language of § 1327(b)" without eviscerating § 1306(a). *Baker*, 620 B.R. at 667. In that court's view § 1306(a) "is a more general statute defining what property comes into the chapter 13 estate," and § 1327(b) "is the more specific statute describing its status following confirmation," and under "traditional canons of statutory construction" the general must yield to the specific. *Id.* But that is not the approach that the Eleventh Circuit has chosen.

[42] In contrast to the estate termination approach, the estate preservation approach privileges § 1306(a) and "accord[s] short shrift to § 1327[.]" Shachmurove, *supra* note 37, at 21.

bankruptcy estate, and the mortgage creditor did not violate the automatic stay when it applied a portion of those payments to attorney's fees.[43] *Id.*

Eight years after *Telfair*, the Eleventh Circuit took a different tack in *Waldron v. Brown (In re Waldron)*, 536 F.3d 1239 (11th Cir. 2008). In *Waldron*, the Chapter 13 debtors attained confirmation of their plan. Six months after confirmation, the husband-debtor sustained personal injuries in a car accident. The husband sought and received bankruptcy court approval of his settlement with the other driver. But when the husband moved for permission to settle his claims for underinsured motorist benefits without further court approval, the bankruptcy court ruled, first, that the underinsured motorist claims were property of the bankruptcy estate and,

---

[43] Five years after *Telfair*, the Eleventh Circuit reaffirmed its holding in the unpublished decision *Muse v. Accord Human Res., Inc.*, 129 F. App'x 487 (11th Cir. 2005). In *Muse*, the Chapter 13 debtor completed his bankruptcy case and received a discharge. While his bankruptcy case was pending, he sued his employers under the Fair Labor Standards Act for unpaid overtime wages. The wage claim arose after the Debtor's Chapter 13 plan was confirmed, but he did not amend his schedules to disclose it. The employers therefore sought summary judgment based on judicial estoppel, arguing that the debtor's failure to schedule the claim in his bankruptcy case barred him from pursuing it in district court. The Eleventh Circuit rejected the employers' argument. Citing *Telfair*, the court explained that "assets acquired post-confirmation are not property of the bankruptcy estate unless they are necessary to maintain the bankruptcy plan." *Muse*, 129 F. App'x at 488. The debtor's unpaid wage claim arose post-confirmation, and it was not necessary for the plan, so it "was not part of the bankruptcy estate, [the debtor] had no duty to disclose it, and [he was] not judicially estopped from bringing his unpaid wage claim" against the employers in district court. *Id.* at 490. Because *Muse* was unpublished, it is "not controlling authority" and "may be persuasive only insofar as its legal analysis warrants." *Brown v. Winn-Dixie Stores, Inc.*, No. CV 214–052, 2015 WL 3448614, at *6 (S.D. Ga. May 20, 2015) (Hall, J.). And it "warrants little weight given the Eleventh Circuit's pronounced shift in *Waldron* on the nature of post-confirmation assets and subsequent holdings reaffirming debtors' continuing statutory duty to amend." *Id. See also Copeland v. Birmingham Nursing and Rehab. Ctr. East, LLC*, No. 2:14–cv–1523–JHH, 2015 WL 4068647, at *5 (N.D. Ala. July 1, 2015) ("[T]he court discredits *Muse* in light of *Waldron*.").

second, that "any settlement must be disclosed by an amendment of the debtors' schedule of assets and administered in the bankruptcy proceeding." *Id.* at 1241. The district court affirmed the bankruptcy court.

On appeal, the debtors relied on *Telfair*, arguing that under § 1327(b) the bankruptcy estate revested in the debtors at confirmation and that the husband's underinsured motorist claims, "which were not part of the [debtors'] plan, did not become property of the estate." *Id.* at 1242. The Eleventh Circuit panel disagreed. *Telfair*, as the court distinguished it, involved "property interests that existed at confirmation," i.e. "[t]he debtor's assets used to make [the] mortgage payments" outside the plan. *Id.* What *Telfair* did not address, the court opined, was "entirely new property interests acquired by the debtor after confirmation and unencumbered by any preexisting obligation," like the husband's underinsured motorist claims. *Id.* In the court's view, "[n]ew assets that a debtor acquires unexpectedly after confirmation by definition do not exist at confirmation and cannot be returned to him then" by operation of § 1327(b).

Instead of applying *Telfair*'s estate transformation approach, the Eleventh Circuit adopted what is sometimes called the "estate replenishment," or the "modified estate preservation," approach. Under that approach, "some property of the estate is vested in the debtor at confirmation, under section 1327(b), but property

30

acquired later vests in the estate, under section 1306(a), until the case ends or is converted[.]" *Id.* at 1243. Put another way:

> While the case is pending, the post-petition property . . . [is] added to the estate until confirmation, the event that triggers [§] 1327(b) and "vests" the property of the estate in the debtor. That is, the property interests comprising the pre-confirmation estate property are transferred to the debtor at confirmation, and this "vesting" is free and clear of the claims or interests of creditors provided for by the plan, [§] 1327(b), (c). Finally, the . . . estate once again accumulates property by operation of [§] 1306(a) until the case is "closed, dismissed, or converted."

*Id.* (quoting *City of Chicago v. Fisher (In re Fisher)*, 203 B.R. 958, 962 (N.D. Ill. 1997)).[44] Applying this estate replenishment approach, the court held that the husband's underinsured motorist claims were property of the bankruptcy estate because they were new assets acquired post-confirmation.[45] *Id.*

---

[44] Or, as one court put it in a post-*Waldron* case, "property obtained after confirmation never vests in the debtor under § 1327(b) because such vesting is a singular event that happens, if at all, upon plan confirmation and affects only property in existence at that time." *Banks v. Kam's Auto Sales (In re Banks)*, 521 B.R. 417, 423 (Bankr. M.D. Ga. 2014).

[45] The estate replenishment approach explicated in *Waldron* has received praise for "attempt[ing] to infuse §§ 1306(a) and 1327 (b) with equal force." Shachmurove, *supra* note 37, at 73 (noting that "this interpretation has garnered a wide following"). "The majority of courts espouse this interpretation." Potts, *supra* note 41, at 33. At the same time, some commentators acknowledge that "[t]he drawback to this theory is the violence it renders to § 1327 by diminishing its most meaningful aspects to meaninglessness." *Id. See also Baker*, 620 B.R. at 669 ("[T]he Court disagrees with the estate replenishment view [adopted in *Waldron*] because it reads § 1306(a) too broadly and gives insufficient weight to § 1327(b)."). What's more, it "creates a complicated mythology to overcome a perceived dissonance between §§ 1306 and 1327 by creating something that otherwise has no support in the Bankruptcy Code: two separate bankruptcy estates, one that is extinguished at confirmation and controlled by the debtor, and another that is not." Potts, *supra* note 33, at 33-72. Others have accused the estate replenishment approach of lacking internal coherence. For example, "[t]aken literally, every existent thing in the bankruptcy estate is transferred to the debtor on confirmation, but any new thing (including proceeds of debtor

31

As to the other issue raised in *Waldron*—whether the husband had an obligation to disclose the settlement proceeds of his post-confirmation claims—the Eleventh Circuit's holding was narrow.[46] Relying on Bankruptcy Rule 1009, in addition to certain Eleventh Circuit precedents, the court recognized a "continuing duty to disclose[.]"[47] *Id.* at 1245. But that duty is not "a free-standing duty to disclose the acquisition of *any* property interest after the confirmation of [the debtor's] plan under Chapter 13."[48] *Id.* at 1246 (emphasis added). Rather, a "bankruptcy court is

---

property) is property of the estate. Therefore, if the debtor buys a car after the confirmation of the plan, the car belongs to the bankruptcy estate. The debtor dares not sell the car without court permission pursuant to section 363(b). But, the pre-confirmation car could be sold post-confirmation without court permission. Proceeds of that car, however, cannot be used without court permission, as the proceeds are property of the estate (even though the car wasn't). This obviously makes no sense." Carlson, *supra* note 36, at 250 (noting that "[t]he Christmas after confirmation is a sad one under this theory, as the [C]hapter 13 trustee scoops up all the presents under the tree."). Another commentator, laboring mightily to reconcile *Waldron* with *Telfair* and *Muse*, has concluded that the relevant distinction is whether new assets acquired post-confirmation were *known* at the time of confirmation: if so, they are *not* estate property (per *Telfair*), and if not, they *are* estate property (per *Waldron*). Jennifer Leigh Shea, *When Does a Post-Confirmation Asset Become Property of the Estate in the Eleventh Circuit?*, 28-SEP Am. Bankr. Inst. J. 34 (September 2009).

[46] Carlson, *supra* note 36, at 254 ("[T]he *Waldron* court's holding was very limited . . . . The court merely held that the bankruptcy court had discretion to order the debtors to amend their schedules."). Even this limited holding has received criticism—the debtor "was uselessly made to amend his schedule because he had the good fortune of being injured in a post-confirmation automobile accident and, therefore, was now the owner of a cause of action under an uninsured motorist act." *Id.*

[47] The Eleventh Circuit also cited, in support of a debtor's continuing duty to disclose, § 521 and Bankruptcy Rule 1007(b), which together require a debtor to file schedules, a statement of financial affairs, and other papers. *Waldron*, 536 F.3d at 1245.

[48] "[S]ome courts have held, often in a simple sentence, that a bankruptcy debtor always has a 'continuing duty to disclose.'" *Boyd*, 618 B.R. at 154. But nothing in the Bankruptcy Code or Bankruptcy Rules explicitly requires "disclosure of property acquired post-petition, and certainly post-confirmation, by amended schedules in a [C]hapter 13 case." *Id.* at 150. *Waldron* recognized

entitled to learn about a *substantial asset* that the court had not considered" at confirmation. *Id.* at 1245 (emphasis added). And the court "has the *discretion*, under Rule 1009, to require a debtor to amend his schedule of assets to disclose a new property interest acquired after the confirmation of the debtor's plan." *Id.* at 1246 (emphasis added). As will be discussed, the manner in which creditors may share in post-confirmation property acquired by the debtor, added to the estate by operation of § 1306(a), appears to be limited to plan modification under § 1329. As the court in *Waldron* explained, disclosure "gives the trustee and creditors a meaningful right to request, under [§] 1329, a modification of the debtor's plan to pay his creditors." *Id.* at 1245. The Eleventh Circuit thus held that the bankruptcy court did not abuse its discretion when it ordered the debtors to amend their schedules to disclose any settlement of the husband's claims.

*Waldron* remains binding precedent in the Eleventh Circuit. And under *Waldron*, the Debtor's 2010 Claim in this case is indisputably property of the bankruptcy estate. The court confirmed the Debtor's plan on April 20, 2010, and the Debtor sustained the injury giving rise to the 2010 Claim less than four months later, on August 31, 2010. Thus, the 2010 Claim, like the underinsured motorist claims in

---

that fact. *Waldron*, 536 F.3d at 1246. For example, Bankruptcy Rule 1007(h) requires a Chapter 13 debtor to file a supplemental schedule disclosing property acquired under § 541(a)(5) (e.g. an inheritance acquired within 180 days post-petition) but, notably, does not require disclosure of other after-acquired property. Fed. R. Bankr. P. 1007(h). "While the duty to disclose a substantial or significant asset that became part of the estate post-confirmation may be a desirable policy, it [is] simply not required" under the Bankruptcy Code or Bankruptcy Rules. *Boyd*, 618 B.R. at 156.

*Waldron*, was a new asset acquired unexpectedly after confirmation. The parties therefore agree that the 2010 Claim was estate property. What makes this case different from *Waldron* is that the 2010 Claim expired in January 2024, giving rise to the Malpractice Claim against Mr. Boykin. That Malpractice Claim arose over ten years after the Debtor received his discharge and over six years after the Chapter 13 case was closed. The novel question before the Court is whether *Waldron* empowers the Trustee to capture the Malpractice Claim for the bankruptcy estate.

### C. The Operation of § 1306(a)(1) Terminated when this Case was Closed

In the Debtor's view, the question before the Court turns on state law. Recall that, although federal law governs whether property belongs to the debtor or to the bankruptcy estate, property interests themselves are "created and defined by state law." *Butner*, 440 U.S. at 55. The bankruptcy estate can "take no greater rights than the debtor himself had" under state law. *Witko v. Menotte (In re Witko)*, 374 F.3d 1040, 1042-43 (11th Cir. 2004) (quoting S. Rep. No. 95-989, at 82 (1978); H. R. Rep. No. 95-595, at 367-68 (1977)). Relying on these principles, the Debtor argues that the Malpractice Claim came into being under Georgia law only after his bankruptcy estate ceased to exist and therefore never became estate property: "Debtor could not have brought the [Malpractice Claim] at a time [when] his Chapter 13 estate was in existence[;] the [Malpractice Claim] did not exist until after his estate had closed." (Dckt. 167, p. 4). The Debtor's argument thus has two premises:

34

first, that the bankruptcy estate at some point ceased to exist, and second, that the Malpractice Claim arose under state law only after that point.[49]

Starting with the second premise, the Debtor correctly observes that the Malpractice Claim's elements accrued, if at all, long after he received his discharge and his bankruptcy case was closed. Under Georgia law, the plaintiff in a legal malpractice action "must establish three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff." *Lalonde v. Taylor English Duma, LLP*, 349 Ga. App. 853, 855 (2019) (quoting *Allen v. Lefkoff, Duncan, Grimes & Dermer, P. C.*, 265 Ga. 374, 375 (1995)).

Here, the third element was satisfied no sooner than January 2024, when Mr. Boykin mistakenly allowed the 2010 Claim to be dismissed, without possibility of revival, by operation of O.C.G.A. § 9-2-60(b), which states that "[a]ny action or other proceeding filed in any of the courts of this state in which no written order is taken for a period of five years shall automatically stand dismissed with costs to be taxed against the party plaintiff." O.C.G.A. § 9-2-60(b). As of that time, the 2010 Claim was no longer viable. *Lalonde*, 349 Ga. App. at 857 ("A claim is considered

---

[49] In his Motion to Exclude Malpractice Claim, the Debtor relied more or less exclusively on the argument that the Malpractice Claim arose too late—"10 years, 2 months, [and] 28 days" after entry of discharge—to become estate property. (Dckt. 151, p. 2). The Trustee takes the Debtor to task for this argument. (Dckt. 164, p. 6). But the Debtor's argument in his brief is considerably more nuanced. (Dckt. 167).

'viable' if further litigation of that claim may lead to a favorable result[.]"). The Debtor therefore lacked any state-law property interests in the Malpractice Claim until January 2024. So far, so good.

But the Debtor's first premise—that the bankruptcy estate no longer existed when the Malpractice Claim arose—is less clear-cut. *When* did the estate terminate, if it terminated at all? Was it on October 16, 2013, when the Debtor received his discharge? Or was it on August 1, 2017, when the Court closed the case? Or does the estate remain in existence to this day because the case was reopened on June 26, 2018? More to the point, for how long does property acquired by a debtor continue to accumulate in the bankruptcy estate by operation of § 1306(a)?

According to the Debtor, the bankruptcy estate "ends at discharge or dismissal and doesn't extend to the date the case is administratively closed." (Dckt. 167, p. 5). Although the Debtor does not elaborate on this theory, he must mean that the estate in this case terminated upon discharge—rather than closure—because the case was not dismissed.[50] The Court finds this argument unpersuasive and the lone case he

---

[50] To be sure, the case was briefly dismissed in 2012. On March 2, 2012, the Chapter 13 Trustee moved to dismiss the case because the Debtor was delinquent on plan payments. (Dckt. 90). The Debtor did not respond to that motion, and the case was dismissed on April 10, 2012. (Dckt. 91). But on April 19, 2012, the Debtor moved to reinstate the case, asserting that he inadvertently failed to request a hearing and that he would be able to pay the balance of the plan. (Dckt. 93). The Trustee consented to reinstatement, and the Court granted the Debtor's motion on May 8, 2012. (Dckt. 94). That order stated as follows: "It is hereby ordered that the order of dismissal in the above-referenced case is hereby set aside and the case is reinstated." (Dckt. 94, p. 1). The Court does not view temporary dismissal followed by reinstatement as terminating the operation of § 1306(a).

36

cites inapposite.[51] Nor does *Waldron* provide much clarity. The closest it comes to doing so is in the Eleventh Circuit's statement that "property acquired [post-confirmation] vests in the estate, under [§] 1306(a), until the case *ends* or is converted." *Waldron*, 536 F.3d at 1243 (emphasis added). It is not clear what exactly it means for a Chapter 13 case to "end," especially in the unusual posture of the case before the Court. But the Court is mindful that the Eleventh Circuit in *Waldron* sought to give effect to both §§ 1306(a) and 1327(b). *Id.* (noting that the estate replenishment approach "harmonizes [the] two apparent[ly] inconsistent sections"). And by its terms, § 1306(a) provides that estate property accrues until "the case is closed, dismissed, or converted . . . whichever occurs first[.]" 11 U.S.C. § 1306(a)(1).

---

[51] Arguing that the estate terminates at discharge, the Debtor cites *In re McIntosh*, No. 11-03417-7-MAM, No. 12-00718-7-MAM, 2015 WL 13774756 (Bankr. S.D. Ala. Jan. 27, 2015). There, the Chapter 13 trustee sought to reconvert the case from Chapter 7 to Chapter 13 to "receive into the [bankruptcy estate] and then distribute to [] creditors proceeds from [the debtors' post[-]confirmation auto accident case settlements." *Id.* at *1. The bankruptcy court denied that request, and the trustee's later motion to reconsider, because a Chapter 13 plan becomes "inoperative" upon conversion to Chapter 7. *Id.* at *2. The Court finds *McIntosh* unhelpful, for three reasons. First, the Court has been unable to find any language in *McIntosh* supporting the Debtor's point about estate termination. Second, the court in *McIntosh* stated, incorrectly, that the Eleventh Circuit "has adopted the estate transformation approach as to what property remains in a [C]hapter 13 estate post[-]confirmation where the 'default rule' [of § 1327(b)] is in effect," citing *Telfair*. *Id.* Inexplicably, *McIntosh* makes no mention of *Waldron*, decided seven years earlier. And third, the local plan in *McIntosh* opted out of § 1327(b)'s default rule—which § 1327(b) permits—by providing that estate property vested in the debtor only upon discharge or dismissal. The confirmation order in this district and in this case, however, follows § 1327(b) in vesting estate property in the debtor upon confirmation. *See* Dckt. 61, p. 1, § 6 ("Property of the estate revests in Debtor upon confirmation pursuant to 11 U.S.C. [§] 1327."). Nothing in *McIntosh* helps answer the question before the Court.

Under § 1306(a), then, entry of discharge is not an event upon which property acquired by the debtor ceases to become property of the Chapter 13 bankruptcy estate. And the Court declines to read into § 1306(a) a requirement that the estate terminate upon discharge. *See In re Studio Five Clothing Stores Inc.*, 192 B.R. 998, 1006 (Bankr. C.D. Cal. 1996) (neither § 1306(a) nor § 1327(b) "makes discharge the relevant event for triggering the termination of the bankruptcy estate"). Instead, the Court will follow the plain language of § 1306(a), meaning that the estate terminates only when the case is closed, dismissed, or converted. When one of those three events takes place, property stops accumulating in the bankruptcy estate. This case was neither dismissed nor converted, but it *was* closed. On the face of § 1306(a), property acquired by the Debtor ceased to become estate property on that date, August 1, 2017.

## D. Reopening the Case Did Not Revive the Operation of § 1306(a)

Had this case remained closed, it would be clear that the operation of § 1306(a) terminated. This case, however, presents an additional complication: the Debtor, with the Trustee's consent, successfully moved to reopen the case "for the limited purpose[s]" of scheduling the 2010 Claim and the 2014 Claim, obtaining Court approval of any settlements of those claims, and distributing any non-exempt proceeds to unsecured creditors. (Dckt. 123, p. 1). The case was closed only for about eleven months, from August 1, 2017, to June 26, 2018. Did reopening resurrect

38

the bankruptcy estate for purposes of § 1306(a) and *Waldron*? In other words, did property acquired by the Debtor after reopening become property of the estate?

No. Under the Bankruptcy Code, the court "shall close" a case "[a]fter an estate has been fully administered and the court has discharged the trustee[.]" 11 U.S.C. § 350(a). A closed bankruptcy case "may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[52] 11 U.S.C. § 350(b). "Reopening a case usually occurs to 'take care of some detail that was overlooked or left unfinished at the time the case was closed.'" *In re Malin*, 652 B.R. 828, 836 (Bankr. N.D. Ga. 2023) (citations omitted). "Bankruptcy courts have broad discretion to reopen a closed case, and in deciding whether to reopen a case, courts generally consider the benefit to creditors, the benefit to the debtor, the prejudice to the affected party and other equitable factors." *In re Calixto*, 648 B.R. 119, 122-23 (Bankr. S.D. Fla. 2023) (citations omitted). *See also* Fed. R. Bank. P. 5010 ("On the debtor's or another party in interest's motion, the court *may*, under § 350(b), reopen a case.") (emphasis added).

Regrettably, the Bankruptcy Code fails to explain in any detail the effect of reopening a closed case. Some courts view reopening as "a purely ministerial task

---

[52] For purposes of § 350(b), the term "other cause" incorporates the standards of Rule 60(b) of the Federal Rules of Civil Procedure (e.g. newly discovered evidence, fraud or misrepresentation, the judgment is void or has been discharged or vacated, and any other reason that justifies relief). *Mohorne v. Beal Bank (In re Mohorne)*, 772 F. App'x 846, 847 (11th Cir. 2019) (unpublished decision).

39

that does not supply any independent relief to the movant." *In re Clark*, 512 B.R. 906, 908-09 (Bankr. N.D. Ill. 2014). *See also In re D'Antignac*, No. 05–10620, 2013 WL 1084214, at *3 (Bankr. S.D. Ga. Feb. 19, 2013) (Barrett, C.J.) ("The mere act of reopening a closed bankruptcy case does not afford any party substantive relief; it is a purely ministerial act with no legal significance for the underlying bankruptcy.").[53] One court put it this way:

> The reopening of a case is of no independent legal significance or consequence . . . . The effect of [§ 350(b)] is merely to resurrect the court file from the stacks of the closed cases, or even from the archives, to enable it to receive a new request for relief. The legislative history on the provision is sparse, but it certainly does not contradict [this] benign interpretation . . . . [T]he purpose for reopening a case is to allow the court to act on a substantive request for relief, and . . . the mere reopening, by itself, accords no independent relief.

*In re Barrett*, No. 05–36825, 2006 WL 2587978 (Bankr. N.D. In. Sept. 8, 2006). Other courts disagree. *See DeVore v. Marshack (In re Devore)*, 223 B.R. 193, 198 (B.A.P. 9th Cir. 1998) (noting that some "courts have held that reopening a bankruptcy case puts the bankruptcy estate back into the process of administration and revives the original case"); *Figlio v. Am. Mgmt. Servs., Inc. (In re Figlio)*, 193

---

[53] "Perhaps in recognition of the procedural or 'ministerial' nature of reopening, the Bankruptcy Code and the Bankruptcy Rules do not contain a specific notice requirement for a motion to reopen." *In re Fayne*, No. 23-30378, 2023 WL 6890908, at *2 (Bankr. N.D. Ohio Oct. 18, 2023).

B.R. 420, 424 (Bankr. D.N.J. 1996) (upon reopening, "[t]he original bankruptcy is revived including all the procedural and substantive rights of the debtor").

Without delving into all the precise consequences of reopening generally, the Court finds that the reopening of this case did not bring § 1306(a) back into effect. Put differently, the mere fact that the Debtor acquired the Malpractice Claim after reopening does not mean that the claim became property of the bankruptcy estate. Nothing in § 350(b) or the case law mandates that property acquired during a reopened a Chapter 13 case *necessarily* belongs to the bankruptcy estate. The Debtor provides a helpful hypothetical on this point: "it would be an absurd result" if "a case reopened to allow the filing of papers necessary for discharge" (e.g. the financial management course certificate or the DSO certification) meant that "an injury claim that coincidentally arose while the case was [re]open[ed]" was "capture[d] for the estate[.]" (Dckt. 167, p. 5). The Court agrees.

Nor does any language in the reopening order warrant breathing new life into § 1306(a). Consistent with § 350(b), this case was reopened for the "limited purpose" of administering assets. And not just any assets, but specifically the 2010 Claim and the 2014 Claim. The Malpractice Claim—which, as discussed above, did not arise until January 2024—did not exist when the order reopening the case was entered on June 26, 2018. The reopening order thus did not, and could not, contemplate distribution of any settlement proceeds from the Malpractice Claim. The upshot is

41

that the Debtor is correct: the Malpractice Claim accrued under Georgia law at a time when § 1306(a) was not operative. It thus did not become estate property, or at least not by virtue of § 1306(a) and *Waldron*. But that isn't the end of the discussion.

E. *Segal v. Rochelle*'s "Sufficiently Rooted" Test Does Not Apply Here

Without necessarily disagreeing with the above analysis, the Chapter 13 Trustee advances a theory that, if the Court accepts it, could capture the Malpractice Claim for the bankruptcy estate in spite of § 1306(a)'s termination. Under the Trustee's theory, the Malpractice Claim "is derivative [of] and is a continuation of the liquidation of the [2010 Claim]," and thus "the fact that the [Malpractice Claim] accrued after the applicable commitment period of the bankruptcy case does not remove it from the bankruptcy estate[.]" (Dckt. 164, p. 4). In other words, "[t]he fact that the collection of the personal injury action [i.e. the 2010 Claim] changed to a malpractice recovery does not remove the asset from the Chapter 13 bankruptcy estate." (Dckt. 164, p. 6). The Trustee's theory is complicated, his supporting cases are not on all fours with this one, and the Court ultimately finds his position untenable. But that requires some elaboration.

First, to the extent the Trustee asserts that the Malpractice Claim is simply a "continuation" of the 2010 Claim, that assertion is incorrect on its face. As the Debtor points out, those were two different claims against two different defendants.

42

(Dckt. 167. P. 4). The 2010 Claim was a personal injury claim based on negligence[54] against the Georgia Ports Authority (and its insurers) brought pursuant to the Georgia Tort Claims Act's sovereign immunity waiver. *See* O.C.G.A. § 50-21-23(a); *Bryant v. Georgia Ports Authority*, 364 Ga. App. 285, 287 (2022). The Malpractice Claim was a legal malpractice claim against Mr. Boykin (and his E&O carrier). Under Georgia law, a legal malpractice claim has different elements from an ordinary negligence claim. *Compare* David Hricik and Charles R. Adams, III, *Georgia Law of Torts* § 2:1 ("Negligence in general") and § 12:12 ("Legal malpractice—Generally") (Dec. 2024 ed.). A legal malpractice claim has specific limitations on damages.[55] *Id.* at § 12:16 ("Legal malpractice—Damages").

The Trustee disputes none of this—because he can't—but nevertheless argues that the settlement proceeds of the Malpractice Claim belong to the bankruptcy estate under an esoteric doctrine of federal bankruptcy law. In a Chapter 7 case, as

---

[54] Mr. Boykin testified that the 2010 Claim was based on negligent operation of the crane that injured the Debtor. (11/13/2024 Tr., at p. 39).

[55] It is true that the plaintiff in a malpractice action must, to establish proximate cause and damages, show that the plaintiff would have prevailed in the underlying suit. This is sometimes referred to as a "suit within a suit." *Leibel v. Johnson*, 291 Ga. 180, 182 (2012) (citations omitted). *See also Stanton v. Stout Kaiser, LLC*, 374 Ga. App. 143, 147 (2025) (quoting *Jim Tidwell Ford, Inc. v. Bashuk*, 335 Ga. App. 668, 670 (2016)) ("A claim for legal malpractice is sui generis insofar as the plaintiff's proof of damages effectively requires proof that he would have prevailed in the original action but for the act of the attorney charged with malpractice."); *Georgia Law of Torts* § 12:15 ("When the malpractice is based upon the handling of prior litigation, the plaintiff must prove "a case within the case," that, but for the lawyer's breach, the prior suit would have had a different and better outcome."). But in the Court's view, the "suit within a suit" requirement does *not* mean that the 2010 Claim and the Malpractice Claim are simply the same asset in a different form. The differences between the two claims are simply too great.

discussed above, estate property consists of "all legal or equitable interests of the debtor in property as of the commencement of the case"—in other words, pre-petition property, with some statutory exceptions already mentioned. 11 U.S.C. § 541(a)(1). But even aside from the statutory exceptions, courts sometimes hold that property a Chapter 7 debtor acquires post-petition nevertheless becomes property of the bankruptcy estate where the after-acquired property is "sufficiently rooted in the pre-bankruptcy past." That test comes from *Segal v. Rochelle*, 382 U.S. 375 (1966), and the Trustee uses it to argue that the Malpractice Claim, despite arising long after the bankruptcy ended (and thus after § 1306(a) became inoperative), nevertheless belonged to the bankruptcy estate.[56]

---

[56] The Trustee mentions in passing § 541(a)(7) but makes no clear argument from it. (Dckt. 164, p. 7). Under § 541(a)(7), estate property includes "[a]ny interest in property that the *estate* acquires after the commencement of the case[.]" 11 U.S.C. § 541(a)(7). It's true that some cases have applied § 541(a)(7) to determine that a post-petition legal malpractice claim was estate property. *See, e.g., O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197 (3d Cir. 2000). But those cases did not arise under Chapter 13. It is not clear what § 541(a)(7) means in the Chapter 13 context, given § 1306(a), and especially in a jurisdiction, like this one, that follows *Waldron*'s estate replenishment theory. A leading treatise suggests that § 541(a)(7) applies in situations where, for example, the trustee enters into a contract after commencement of the case: "[t]he estate's interest in such a contract would . . . be property of the estate" under § 541(a)(7). 5 *Collier on Bankruptcy* ¶ 541.16 (R. Levin & H. Sommer eds., 16th ed. 2025). It's even less clear what this has to do with a legal malpractice claim. Similarly, and only out of a sense of completeness, the Court rejects any suggestion that the Malpractice Claim is estate property by virtue of § 541(a)(6), which refers to "[p]roceeds, product, offspring, rents, or profits of or from property of the estate[.]" 11 U.S.C. § 541(a)(6). At least one court has suggested that a post-petition legal malpractice claim that "came into existence as a result of alleged damage to property of the estate" constitutes "proceeds" under § 541(a)(6). *In re Haynes*, No. 93–72106, 1999 WL 33592904, at *6 (Bankr. C.D. Ill. March 2, 1999). The term "proceeds" is not defined in the Bankruptcy Code. 5 *Collier on Bankruptcy* ¶ 541.15 (noting that the term is not restricted to its meaning under the Uniform Commercial Code). *See Bracewell*, 454 F.3d at 1245 (holding that post-petition federal agricultural assistance was not "proceeds"); *In re Wright*, 545 B.R. 541, 555 (Bankr. S.D. Tex. 2016) (defining "proceeds" as "that which proceeds, is derived, or results from something else; that which is obtained or gained

In *Segal*, two individual debtors' business partnership lost money in 1961. On September 27, 1961, they and their partnership filed for bankruptcy under the Bankruptcy Act of 1898. The individual debtors then carried back the 1961 business losses to the years 1959 and 1960, receiving loss-carryback tax refunds from the Internal Revenue Service. Under applicable federal tax law, the debtors had to wait until the calendar year ended—after the petition date—before seeking the tax refunds. Because the debtors received the refunds post-petition, they requested that the bankruptcy referee award the refunds to them instead of to the bankruptcy estate. The referee disagreed, ruling that the refunds belonged to the estate, and the district court, the Fifth Circuit, and the Supreme Court all affirmed. As the Supreme Court put it, the loss-carryback tax refunds were "sufficiently rooted in the pre-bankruptcy past and so little entangled with the [debtors'] ability to make an unencumbered fresh start that [they] should be regarded as" estate property. *Id.* at 380.

*Segal*, of course, did not involve a claim for legal malpractice. But several lower courts applying the "sufficiently rooted" test have determined that a post-petition legal malpractice claim belonged to the bankruptcy estate. One such case was *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez (In re Alvarez)*, 224 F.3d 1273 (11th Cir. 2000). In *Alvarez*, the Chapter 7 debtor filed a malpractice

---

by any transaction or process . . . esp. the money obtained from an event, activity, or enterprise"). Whatever Congress intended "proceeds" to mean in this context, the Court finds that a legal malpractice cause of action doesn't fall within that meaning.

claim against his bankruptcy counsel for ignoring his instructions to file a Chapter 11 reorganization case and instead filing a Chapter 7 liquidation, causing the debtor to lose control of his assets. In the malpractice case, bankruptcy counsel's law firm moved for judgment on the pleadings, arguing that the malpractice claims were property of the bankruptcy estate and thus that the Chapter 7 trustee was an indispensable party to the malpractice suit. The bankruptcy court held that the malpractice claims were not estate property, but the district court disagreed.

On appeal, the Eleventh Circuit ruled in favor of the law firm, holding that the malpractice claims were property of the bankruptcy estate, for two reasons. First, the court held that the elements of legal malpractice accrued "at the moment of bankruptcy filing." *Id.* at 1277-78. Because § 541(a)(1) includes in the estate interests "as of" filing, a property interest "arising simultaneously with the filing of [the debtor's] bankruptcy petition" was estate property. *Id.* at 1278. Second, and more pertinent to this case, the court applied the rationale of *Segal* and determined that the debtor's legal malpractice action was "sufficiently rooted in his pre-bankruptcy past that it should be considered property of [the debtor] as of the commencement of his bankruptcy case, and thus property of [the] estate." *Id.* at 1279. Specifically, before the petition was filed, the debtor "established an attorney-client relationship" with the law firm, he instructed the firm to file a Chapter 11 petition, and the firm instead prepared a Chapter 7 petition. *Id.* In the Eleventh

Circuit's view, the malpractice claim in *Alvarez* was "even more firmly rooted in the pre-bankruptcy past" than the tax refunds in *Segal*. *Id.* (citations omitted). Whether *Alvarez* remains binding precedent in the Eleventh Circuit is not clear.[57]

Whatever the precedential value of *Alvarez*, other courts have also found post-petition legal malpractice claims to be estate property under *Segal*'s "sufficiently rooted" test. *See, e.g., O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197 (3d Cir. 2000)[58]; *Winick & Rich, P.C. v. Strada Design Associates, Inc. (In re Strada Design*

---

[57] *Segal*, as mentioned, arose under the Bankruptcy Act of 1898, which was replaced by the modern Bankruptcy Code (as amended by subsequent legislation) in 1978. In *Alvarez*, the Eleventh Circuit explained that "the legislative history [to the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598] expressly indicates that the current Code follows *Segal*'s result." *Alvarez*, 224 F.3d at 1278 n. 13. *See* S. Rep. No. 95-989, at 82 (1978); H. R. Rep. No. 95-595, at 367 (1977) (stating in reference to § 541 that "[t]he result of *Segal v. Rochelle*, 382 U.S. 375 (1966), is followed, and the right to a refund is property of the estate."). How exactly Congress incorporated *Segal* into § 541(a) is not at all clear from the statutory text. And in *Bracewell v. Kelley*, 454 F.3d 1234, 1242 (11th Cir. 2006), the Eleventh Circuit stated that § 541(a) "controls our analysis [of estate property] rather than *Segal*'s test" because "the *Segal* decision told us how to define property under the old bankruptcy code, before it was amended in 1978 to include an explicit definition of property." *Id.* at 1242. The Eleventh Circuit in *Bracewell* declined to "attribute to the Supreme Court [in *Segal*] an intent to construe legislative language that it had not seen and which would not even exist for another dozen years." *Id.* To the extent *Alvarez* suggested otherwise, the court in *Bracewell* dismissed that as "superfluous language . . . not necessary to its holding." *Id.* On the other hand, the Eleventh Circuit follows the prior-precedent rule, which requires a panel to "comply with [Eleventh Circuit] precedent unless the en banc court or the Supreme Court abrogates it." *Sweetapple v. Asset Enhancement, Inc. (In re Asset Enhancement, Inc.)*, 87 F.4th 1271, 1280 (11th Cir. 2023). Both *Alvarez* and *Bracewell* were panel decisions, and *Alvarez* predated *Bracewell* by six years. In sum, whether *Segal*'s "sufficiently rooted" test remains good law in the Eleventh Circuit is anyone's guess.

[58] In *O'Dowd*, the debtor filed for Chapter 11, but the case was converted to Chapter 7. The debtor hired attorneys to sue for malpractice another attorney who represented her in the purchase of an apartment building. After settling the malpractice suit, the debtor discovered that her attorneys failed to raise certain claims in the malpractice suit, so she filed a second malpractice suit, this time against her attorneys in the first malpractice suit. The second malpractice suit accrued post-petition. *O'Dowd*, 233 F.3d at 203. In the second malpractice suit, the defendants argued that the malpractice claims were property of the bankruptcy estate and thus could not be prosecuted by the

*Associates, Inc.)*, 326 B.R. 229 (Bankr. S.D.N.Y. 2005)[59]; *In re Tomaiolo*, 205 B.R.

10 (Bankr. D. Mass. 1997).[60] In other cases, courts applying the *Segal* test have

found that malpractice claims lacked pre-petition roots. *See, e.g. Witko*, 374 F.3d at

---

debtor. The bankruptcy court ruled that the claims were estate property under both the *Segal* test and § 541(a)(7). The district court rejected the bankruptcy court's *Segal* analysis but affirmed under § 541(a)(7), and the Third Circuit likewise affirmed. Although the Third Circuit purported to base its decision solely on § 541(a)(7), it also used language reminiscent of the *Segal* test, emphasizing that the second malpractice suit "could be traced directly to pre-petition conduct" and that it was "conceptually impossible to sever the [second malpractice suit] from the underlying [first malpractice suit]." *Id.* at 203-04.

[59] In *Strada*, the Chapter 7 debtors sued their bankruptcy counsel's law firm, alleging pre-petition malpractice for failure to advise the debtors that they could reorganize under Chapter 11, malpractice in filing the Chapter 7 petitions, and post-petition malpractice for failing to advise the debtors that they could convert from Chapter 11 to Chapter 7. *Strada*, 326 B.R. at 234. After the debtors (and their owners and affiliates) sued for malpractice in state court, the law firm agreed to settle with the trustee, but the state-court plaintiffs objected on grounds that the claims belonged to the debtors personally rather than to the estate. In an adversary proceeding filed to resolve that dispute, the bankruptcy court ruled that the pre-petition and filing malpractice claims were clearly estate property. As to the claim for post-petition malpractice, the court found that it too belonged to the estate under both § 541(a)(7) and the *Segal* test, citing the claim's "roots [in] the [d]ebtors' pre-bankruptcy activities and its close nexus to the alleged pre-petition malpractice." *Id.* at 240.

[60] In *Tomaiolo*, the debtor filed for Chapter 11, but the case was converted to Chapter 7. The debtor was later indicted and convicted on federal charges of bankruptcy fraud for false statements in his bankruptcy papers. He then sued his bankruptcy counsel for malpractice in allegedly negligently advising him to file for bankruptcy, preparing and filing a defective Chapter 11 petition, failing to correct errors and omissions in the bankruptcy papers, failing to "properly handle" the bankruptcy proceeding, and failing to advise the debtor of his rights and obligations in bankruptcy. *Tomaiolo*, 205 B.R. at 12-13. The Chapter 7 trustee sought an order requiring the law firm to turn over its files on the case, requiring the bankruptcy court to determine whether the debtor or the estate owned the claims. The court found that all but one of the claims, though accruing post-petition, had pre-petition roots under *Segal*. *Id.* at 14-15. The lone exception was the claim that counsel did not properly handle the bankruptcy proceeding, which had no pre-petition roots but was nevertheless held to be estate property under § 541(a)(7). *Id.* at 15-16.

1044[61]; *In re de Hertogh*, 412 B.R. 24 (Bankr. D. Conn. 2009)[62]; *Casey v. Grasso (In re Riccitelli)*, 320 B.R. 483 (Bankr. D. Mass. 2005).[63]

These cases provide some support for the Trustee's theory. But not much. The Court rejects the Trustee's reliance on the *Segal* test for two reasons. First, unlike a debtor whose malpractice claim accrues post-petition, the debtors in *Segal* "*had* an interest under applicable law when the case began[.]" *Holstein v. Knopfler (In re Holstein)*, 321 B.R. 229, 238 (Bankr. N.D. Ill. 2005) (emphasis added). Because they "had both prior net income and a net loss when their petitions were filed," the *Segal* debtors "apparently would have deserved an immediate refund had their tax year

---

[61] In *Witko*, the debtor filed for bankruptcy in 1999. In 2000, a state court denied his request for alimony in his divorce proceeding, prompting the debtor to sue his divorce counsel for malpractice. The trustee sought and received a determination from the bankruptcy court that the malpractice claim was estate property under *Segal*, and the district court affirmed. The Eleventh Circuit reversed, distinguishing *Alvarez*, because the debtor "did not suffer any harm from the alleged legal malpractice prior to or contemporaneous with filing his bankruptcy petition." *Id.* at 1044.

[62] In *de Hertogh*, the Chapter 7 debtors sued their bankruptcy counsel for causing them to lose the homestead exemption to which they would otherwise have been entitled. The trustee gave notice of his intent to abandon any interest of the estate in the malpractice claim, and the debtors' bankruptcy counsel objected. The bankruptcy court ruled that the malpractice claim accrued post-petition, was not estate property under § 541(a)(1), did not become estate property under § 541(a)(7), and, in the alternative, lacked sufficient pre-petition roots under *Segal*. *de Hertogh*, 412 B.R. at 31.

[63] In *Riccitelli*, the bankruptcy court denied the Chapter 7 debtor's claimed homestead exemption because he failed to file a declaration of homestead under state law. The trustee sold the property, then filed an adversary proceeding against the debtor's bankruptcy counsel for failing to file a declaration of homestead for the debtor pre-petition, and for failing to ascertain that no declaration had been filed. Bankruptcy counsel moved to dismiss, arguing that the malpractice claim was not estate property. Applying *Segal*, the court found that "the pre[-]petition roots of [the malpractice] claim, shallow to begin with, [were] overwhelmed by significant post[-]petition events in the accrual of the claim[.]" *Riccitelli*, 320 B.R. at 492. Specifically, the harm to the debtor took place post-petition, and "the right lost by counsel's alleged negligence . . . was one that the Bankruptcy Code gave the [d]ebtor *as against the estate*." *Id.* (emphasis in original).

terminated on that date." *Id.* (quoting *Segal*, 382 U.S. at 381). "*Segal*, then, does not

expand estate property to include [*any*] legal or equitable interests a debtor acquires

post-petition[] as long as a clever trustee can tie those interests to the 'pre-bankruptcy

past.'" *Id.*

Second, and more importantly, *none* of the cases applying the *Segal* test to

legal malpractice claims arose in the context of Chapter 13. All were Chapter 7 cases,

or cases filed under Chapter 11 that were later converted to Chapter 7, in which the

legal malpractice claims at issue arose post-petition but had pre-petition roots. In a

Chapter 7 case, the only question is whether a malpractice claim accrued pre-petition

or post-petition. The petition "effects a definite cleavage in time, so that property of

the debtor owned on that date becomes property of the bankruptcy estate and after-

acquired assets, with certain exceptions, become the debtor's personal property, free

of all claims that are discharged in the bankruptcy case." *In re Powell*, 511 B.R. 107,

111 (Bankr. C.D. Ill. 2014) (citing *White v. Stump*, 266 U.S. 310, 313 (1924)). A

Chapter 13 case, especially in a jurisdiction following the estate replenishment

theory expounded in *Waldron*, is considerably more complicated due to the

operation of §§ 1306(a) and 1327(b). The Trustee acknowledges this fact in his

brief.[64] (Dckt. 164, p. 6).

---

[64] The Trustee states that "[w]ere this bankruptcy case filed pursuant to Chapter 7, the
determination of [whether] the post-petition malpractice action were property of the bankruptcy
estate would include an analysis of when the malpractice action accrued pursuant to state law and

Here, the Malpractice Claim arose not just post-petition, not just post-confirmation, but post-discharge and post-closure. In essence, the Trustee argues that the Court should graft the *Segal* test onto *Waldron*, such that the Chapter 13 bankruptcy estate could swallow an asset (i.e. the Malpractice Claim) acquired over a decade after a debtor receives his discharge and over six years after closure, as long as the trustee can show that the asset had "sufficient roots" in post-confirmation estate property (i.e. the 2010 Claim). Nothing in the Bankruptcy Code or the case law warrants such a dramatic expansion of *Segal*'s "sufficiently rooted" test, even assuming the test remains good law as to a post-petition malpractice claim in a Chapter 7 case. The Malpractice Claim did not become estate property by virtue of the *Segal* test—its roots do not go that deep.

## F. The Debtor's Plan Can No Longer be Modified under § 1329

Even if the Court accepted the Trustee's theory and declared the Malpractice Claim property of the bankruptcy estate, the Trustee would still face an insurmountable obstacle preventing the settlement proceeds from being distributed to unsecured creditors. Strangely, neither party directly addressed this issue in their briefs, but the Court finds it dispositive. As mentioned, *Waldron* teaches that the purpose of requiring Chapter 13 debtors to disclose substantial assets acquired post-

---

if there was a sufficient nexus to pre-petition acts to determine that the post-petition malpractice action is estate property. The same analysis, however, is not relevant for a Chapter 13 case." (Dckt. 164, p. 6).

confirmation is to "give[] the trustee and creditors a meaningful right to request, under [§] 1329, a modification of the debtor's plan to pay his creditors." *Waldron*, 536 F.3d at 1245. Modification is thus the mechanism enabling creditors to share in a new asset acquired by the debtor post-confirmation. The problem for the Trustee is that it's too late to modify the Debtor's plan.

Modification of a confirmed Chapter 13 plan is governed by § 1329(a), which provides in relevant part as follows:

> (a) At any time after confirmation of the plan *but before the completion of payments under such plan*, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
>
> > (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
> >
> > (2) extend or reduce the time for such payments;
> >
> > (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan; or
> >
> > (4) reduce amounts to be paid under the plan by the actual amount expended by the debtor to purchase health insurance for the debtor . . . .

11 U.S.C. § 1329(a) (emphasis added). Post-confirmation plan modification must alter the confirmed plan in one of the four ways listed in § 1329(a). *Whaley v. Guillen (In re Guillen)*, 972 F.3d 1221, 1225 (11th Cir. 2020) ("Section 1329 permits debtors, unsecured creditors, and trustees to modify confirmed plans in any one of

four ways[.]"). A proposed modification must comply with all the confirmation requirements of §§ 1322(a), 1322(b), 1323(c), and 1325(a).[65] 11 U.S.C. § 1329(b). Section 1329 "does not impose a requirement that the bankruptcy court find any change in circumstances before modifying a confirmed plan."[66] *Guillen*, 972 F.3d at 1226.

Two provisions of § 1329 bar modification in this case. First, § 1329(a) permits modification "[a]t any time after confirmation of the [original] plan but before the completion of payments under such plan[.]" 11 U.S.C. § 1329(a). "The provision plainly sets forth a temporal requirement[.]" *In re Stanke*, 638 B.R. 571, 574 (Bankr. N.D. Tex. 2022). "Consistent with the plain language of 11 U.S.C. § 1329(a) . . . 'it is largely undisputed' that a plan may not be modified once the debtor has completed payments under that plan." *In re Ivery*, 667 B.R. 317, 320 (Bankr. N.D. Miss. 2025) (quoting *Meza v. Truman (In re Meza)*, 467 F.3d 874, 878 (5th

---

[65] Left unaddressed by *Waldron* is whether § 1329(b) *requires* plan modification to distribute post-confirmation settlement proceeds. Under § 1329(b), "the requirements of [§] 1325(a) . . . apply to any modification[.]" 11 U.S.C. § 1329(b). Section 1325(a)(4) (the "best interest of creditors" test) requires Chapter 13 creditors to receive at least as much in value "as of the effective date of the plan" as they would have received in a Chapter 7 liquidation. 11 U.S.C. § 1325(a)(4). In the context of plan modification, does the term "effective date of the plan" refer to the effective date of the original plan (at which time the post-confirmation cause of action did not exist) or the effective date of the proposed modification? Courts disagree. *See* Christopher Conte, *Everyone Wants a Piece: Handling Post-Petition Funds in Chapter 13*, 43-MAR Am. Bankr. Inst. J. 26 (March 2024).

[66] *But see Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle)*, 12 F.3d 1008, 1011 (11th Cir. 1994) ("Congress designed § 1329 to permit modification of a plan due to changed circumstances of the debtor unforeseen at the time of confirmation.").

Cir. 2006)). "[I]f a trustee could amend a Chapter 13 plan after the debtor completes his or her payments to the trustee, the mandatory nature of the discharge provision [11 U.S.C. § 1328] would be eviscerated." *Id.* (quoting *Meza*, 467 F.3d at 878). "Accordingly, the general rule is that if a debtor completes all plan payments before the trustee seeks modification, § 1329(a) bars the modification." *Id.* (citing *Meza*, 467 F.3d at 878).

Here, the Debtor completed his plan payments 12 years ago, in 2013. The Trustee acknowledged that fact when he filed his September 9, 2013 notice of completion of plan payments, which informed the Debtor that "you have paid sufficient funds to complete your case."[67] (Dckt. 109). And on October 16, 2013, the Debtor received a discharge, which necessarily means that his plan payments were complete: § 1328(a) states that "the court shall grant" a discharge "as soon as practicable after completion by the debtor of all payments under the plan[.]" 11 U.S.C. § 1328(a). To permit the Trustee to modify the Debtor's plan in 2025 to distribute to unsecured creditors proceeds from the Malpractice Claim settlement would be to contravene the plain language of § 1329(a).

---

[67] The case law draws a distinction between a debtor's completion of plan payments and the trustee's filing of a notice memorializing that fact. *See Zisumbo*, 519 B.R. at 859 ("The plain reading of § 1329(a) unambiguously provides that any modification must be before the completion of payments under the plan, not when the Trustee submits a Notice of Completed Plan Payments or the debtor seeks a verification and request for a discharge."); *In re Ezzell*, 438 B.R. 108, 115 (Bankr. S.D. Tex. 2010) (noting that "it has generally been held that a plan is 'complete' when the debtor makes all the payments to the trustee").

Second, § 1329(c) provides that a modified plan "may not provide for payments over a period that expires after the applicable commitment period under section 1325(b)(1)(B) after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time."[68] 11 U.S.C. § 1329(c). "Section 1329(c) thus 'defines the temporal window within which modified payments . . . may be made by reference to the applicable commitment period.'" *In re Goldston*, 627 B.R. 841, 854 (Bankr. D.S.C. 2021). "[T]he modification cannot extend the payment period beyond five years after the first plan payment was due, and cannot extend the original commitment period of the debtor's disposable income except for cause." *In re Scarver*, 555 B.R. 822, 827 (Bankr. M.D. Ala. 2016).[69]

---

[68] The temporal limitations of § 1329(c) thus mirror those in § 1322(d)(2). Under § 1322(d), a below-median debtor's Chapter 13 plan "may not provide for payments over a period that is longer than 3 years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than 5 years." 11 U.S.C. § 1322(d)(2). Section 1329(c) similarly prohibits a modification that extends a plan beyond a below-median debtor's applicable commitment period except for cause, and in any not for a period longer than five years. "Because the applicable commitment period for an above-median debtor is five years, the [§ 1329(c)] limitation now applies only in the case of a below-median debtor, for whom the applicable commitment period is three years." *Chapter 13 Practice & Procedure* § 11:11. This deliberate parallelism underscores the importance Congress placed on the maximum duration of a Chapter 13 plan.

[69] *See also McKinney v. Russell*, 567 B.R. 384, 390 (M.D. Ala. 2017) ("[A]s with the confirmation of a plan in the first instance, the court may not approve a modified plan that requires payments to be made more than five years after the first payment came due."); *In re Nelson*, 646 B.R. 810, 816 (Bankr. E.D. Wis. 2022) ("[A] request to modify a confirmed plan that expressly results in a plan payment period exceeding 60 months fails to comply with 11 U.S.C. § 1329 and cannot be granted."); *In re Talison*, 597 B.R. 87, 88 (Bankr. E.D. Mich. 2019) ("[A]pproval of this proposed plan modification is impermissible, because the plan as modified would exceed the five-year limit

Here, the Debtor's applicable commitment period was 36 months, or three years, a function of his below-median income. He evidently fell behind on pre-confirmation payments,[70] because the Trustee's motion to confirm plan as amended stated that payments would be increased, or the plan term extended, "to cure [and] to pay [the] plan as proposed." (Dckt. 36, p. 1). The Order Confirming Plan stated that "[p]ayments are hereby approved for a period not to exceed five years." (Dckt. 61, p. 1, ¶ 1). The Trustee's Report of Confirmation reiterated that the plan was confirmed with monthly payments "for a minimum period of 36 months."[71] (Dckt. 71, p. 1). According to the Trustee's Final Report and Account, filed after discharge was entered, the Trustee "filed action[s] to remedy default by the [D]ebtor in performance under the plan" three times while the case was pending. (Dckt. 116, p. 1, ¶ 4). Those delinquencies meant that 47 months elapsed from filing to the last payment, and at the time the Final Report and Account was filed, the case had been pending for 52 months.[72] (Dckt. 116, p. 1, ¶¶ 4, 6-7).

---

in 11 U.S.C. § 1329(c)."). *Cf. In re Humes*, 579 B.R. 557, 560 (Bankr. D. Colo. 2018) ("Debtors should not have to make more than sixty payments[.]").

[70] *See* 11 U.S.C. § 1326(a).

[71] The Court's General Order No. 1997-3 provides that "[i]n all Chapter 13 cases confirmed after October 1, 1997, the Chapter 13 Trustee shall file with the Court and serve upon all creditors filing claims as soon as practical following confirmation the Trustee's report of all claims filed in the case and the Trustee's treatment of such claims under the plan as confirmed."

[72] The May 8, 2012 order reinstating the case after its temporary dismissal extended plan payments to 39 months "as needed to fund the balance of the plan." (Dckt. 94, p. 1).

It is therefore true that the Debtor's commitment period was less than the maximum duration of 60 months. But the language of § 1329(c) mandates that "the court may not approve a period that expires after five years after" the time "that the first payment under the original confirmed plan was due[.]"[73] 11 U.S.C. § 1329(c). *See In re Maldonado*, 646 B.R. 917, 920-21 (Bankr. D. Utah 2022) (holding that Chapter 13 case could not be reopened over a year after debtors completed 56-month case to modify plan to administer undisclosed post-confirmation cause of action). The 52-month duration of the Debtor's plan is thus irrelevant to the § 1329(c) temporal limitation.

Courts disagree as to whether the language "the time that the first payment under the original confirmed plan was due" in § 1329(c) refers to the date the first pre-confirmation payment was due under § 1326(a)(1) or to the date the first post-confirmation payment was due. Judge Dalis held that "[t]he appropriate time from which to calculate the length of the Chapter 13 plan is the date at which the debtor

---

[73] In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which, among other things, amended § 1329 by creating a temporary § 1329(d) permitting impacted Chapter 13 debtors to modify their plans for a term of up to 7 years, or 84 months. *See* CARES Act, Pub. L. No. 16-136, Division A, Title I, § 1113(b)(1)(C). Under the CARES Act's terms, that provision was due to sunset one year after its March 27, 2020 enactment. *Id.* at §§ 1113(b)(2)(A)(iii) and 1113(b)(2)(B). The one-year sunset was later extended by one year under the COVID-19 Bankruptcy Relief Extension Act of 2021, enacted on March 27, 2021. *See* COVID-19 Bankruptcy Relief Extension Act of 2021, Pub. L. No. 117-5, § 2(a)(2). The sunset was not further extended, and thus § 1329(d) dropped out of the Bankruptcy Code on March 27, 2022. *See In re Bohinski*, 638 B.R. 870, 871 n. 1 (Bankr. E.D. Mich. 2022).

is first obligated to begin making payments" under § 1326(a)(1). *Baxter v. Evans (In re Evans)*, 183 B.R. 331, 332-33 (Bankr. S.D. Ga. 1995) (Dalis, J.). He reasoned that to do otherwise would be to "impose an additional burden on . . . debtors, not authorized by the Code, requiring the making of pre-petition payments due pursuant § 1326(a)(1), but not counting those payments under the term set forth in the plan." *Id.* at 333. In consequence, "[t]he five-year maximum repayment period imposed by [§ 1322(d)] and § 1329(c) would be impermissibly extended by the amount of time passing between filing and confirmation." *Id.* His view has gained wide acceptance. *See In re Humes*, 579 B.R. 557, 560-61 (Bankr. D. Colo. 2018) (Section 1329(c) "prohibits a modification that would cause the plan's length to exceed five years."); *In re Schuster*, No. 10–01175, 2015 WL 9282447, at *4 (Bankr. D.D.C. Dec. 18, 2015) ("Like the court in *Evans*, I conclude that when measuring the five-year maximum duration of a modified plan, the measurement runs from the date on which the first payment was due under 11 U.S.C. § 1326(a).").

Whatever the correct view, the outcome here is the same. It is not evident from the record when exactly the first payment was due, but given the April 20, 2010 confirmation date, it's indisputable that more than five years have passed since the first plan payment was due.[74] In fact, it's been over 15 years. To allow the Trustee

---

[74] Assuming Judge Dalis had the correct interpretation of § 1329(c), the first plan payment would have been due within 30 days of the July 30, 2009 petition date, as required by § 1326(a)(1).

to modify the plan at this late date would violate the "clear policy of Congress regarding time limits in a Chapter 13 case[.]"[75] *In re Gillis*, 664 B.R. 1, 9 (Bankr. D. Mass. 2024). The legislative history to the Bankruptcy Reform Act of 1978 makes clear that "Congress deliberately included this time limitation[.]" *In re Ingram*, 531 B.R. 121, 125 (Bankr. D.S.C. 2015). As stated in the 1977 House Report:

> Inadequate supervision of debtors attempting to perform under wage earner plans have made them a way of life for certain debtors. Extensions on plans, new cases, and newly incurred debts put some debtors under court supervised repayment plans for seven to ten years. This has become the closest thing there is to indentured servitude; it lasts for an [un]indentifiable period and does not provide the relief and fresh start for the debtor that is the essence of modern bankruptcy law.

H. R. Rep. No. 95-595, at 117.[76] Adhering to the text of §§ 1329(a) and 1329(c), as bolstered by the congressional policy expounded in the legislative history, the Court would not permit the Trustee to modify the Debtor's plan to distribute to unsecured

---

[75] Some courts, it is true, will grant a debtor additional time beyond the five-year maximum to complete the plan. "The debtor may have missed some payments during the term of the plan and needs additional time to catch them up," or perhaps "the total amount of the allowed claims is larger than expected at confirmation," so "[t]he debtor may require more time to make additional payments so that creditors receive what the plan promised." *Chapter 13 Practice & Procedure* § 4:9. Putting aside whether such extensions are permissible, that isn't what happened here. In this case, the Debtor completed his plan and paid creditors what they were promised—indeed, *more than* what they were promised.

[76] *See also Chapter 13 Practice & Procedure* § 4:9 ("The purpose of . . . § 1322(d)'s limitation on the duration of a plan is to prevent the debtor from being committed to make payments for an inordinate amount of time[.]").

59

creditors the Malpractice Claim settlement proceeds even if they were property of the bankruptcy estate.

G. The Debtor Has Not Consented to Distribution of Malpractice Settlement Funds

With plan modification forever foreclosed, the only way for the Trustee to distribute the settlement proceeds would be with the Debtor's consent. This is not necessarily plan modification in the strictest sense but may nevertheless allow creditors to share in settlement proceeds. Here, the Trustee, framing the issue as a matter of judicial estoppel,[77] argues that the Debtor already gave his consent when

---

[77] The Court rejects the Trustee's framing. As mentioned, judicial estoppel applies where "the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." *Slater*, 871 F.3d at 1180. Here, the Trustee accuses the Debtor of taking contrary positions at various times in this bankruptcy case. According to the Trustee, Debtor's counsel represented at the September 11, 2024 hearing that the Malpractice Claim settlement funds "would be paid into the bankruptcy case, the Court took the representation into consideration in entering the approval order" of the 2014 Claim settlement. (Dckt. 164, p. 9). And, the Trustee adds, he "relied on the representation to not raise any issues with regard to the motion to retroactively approve the settlement at that time with the assumption that the case would be paid in full from the [Malpractice Claim] resolution." (Dckt. 164, p. 9). The Court has scoured the transcript of the September 11, 2024 hearing and has found no such representation by Debtor's counsel. The parties simply stated at that hearing that the Malpractice Claim settlement would be brought before the Court at a later date. (9/11/2024 Tr., at pp. 3-6, 10-11). To the extent the Trustee bases his argument on the Court's order approving Mr. Boykin's employment to prosecute the 2014 Claim, the Court notes that the 2014 Claim—by the Trustee's own admission—did not belong to the bankruptcy estate, and that in any event the Bankruptcy Code did not require the Debtor to obtain Court approval of Mr. Boykin's employment as special counsel. *See Smith v. Meredith (In re Smith)*, 637 B.R. 758, 774 (Bankr. S.D. Ga. 2022) (Coleman, C.J.) ("Because § 327(e) does not apply to attorneys hired by a Chapter 13 debtor, such debtor's employment of a personal injury attorney is not subject to court approval."). To the extent the Trustee relies on the language in the reopening order, there the Debtor consented to turn over only the proceeds of two personal injury causes of action, not a malpractice cause of action. As will be discussed, no malpractice claim then existed, and the Debtor thus could not have contemplated turning over to the Trustee any settlement proceeds from such a claim. *Nothing whatsoever* in the record suggests that the Debtor made contradictory statements for the purpose of making a mockery of the judicial system.

60

his bankruptcy counsel signed the June 26, 2018 order reopening this case. That order, as mentioned, reopened the case "for the limited purpose of listing additional claims arising out of an accident occurring in 2010 [i.e. the 2010 Claim] and an additional claim for personal injuries arising from a work accident on December 18, 2014 [i.e. the 2014 Claim]." (Dckt. 123, p. 1). The order went on to state that "[a]ny settlement shall be approved by the Court, and any non-exempt proceeds shall be submitted to the Chapter 13 Trustee for the benefit of unsecured creditors." (Dckt. 123, p. 1). Although it may be true that the modification requirements of § 1329—specifically, the temporal limitations of §§ 1329(a) and (c)—may be bypassed with the Debtor's consent, the Debtor has not consented in this case.

In another case, the Court assumed, without deciding, that the trustee, in seeking to modify a confirmed plan, may circumvent the § 1329 modification requirements by obtaining the debtor's consent.[78] Other courts have likewise recognized consent as an alternative to plan modification.[79] *But see Sys. & Servs.*

---

[78] *See Smith v. Meredith (In re Smith)*, 637 B.R. 758, 780 n. 23 (Bankr. S.D. Ga. 2022) (Coleman, C.J.) ("In this district, the Trustee often simply requests the funds after learning of a proposed settlement, and Debtors routinely consent to such requests by agreeing to turn over the non-exempt settlement proceeds, obviating the need for a modified plan to be filed. On other occasions, the Trustee seeks to modify the plan, many times even before the amount of a settlement is known, and likewise debtors typically consent to such modification . . . .").

[79] *See HomeQ Serv. Corp. v. Hauf*, No. 4:06-CV-83 (CDL), 2007 WL 196857, at *4-5 (M.D. Ga. Jan. 23, 2007). In *Hauf*, the district court agreed with the following analysis of the bankruptcy judge: "At first blush it seems like a good argument that a plan . . . may not be modified after it has paid out. That assumes, it seems to me, what is probably not the case, that a plan must be modified for the trustee to distribute money that has come into the trustee's hands with consent of the debtors for the purpose of making distributions to unsecured creditors who have filed claims

*Techs., Inc. v. Davis (In re Davis)*, 314 F.3d 567, 570-71 (11th Cir. 2002) (opining that Chapter 13 trustee cannot "bypass[ ] the adjudicative process surrounding [ ] [p]lan modification").

Again assuming without deciding that the Debtor's consent would allow the Trustee to skip plan modification—and thereby get around §§ 1329(a) and (c)—the Court nevertheless finds that the Debtor has not consented to share with creditors the Malpractice Claim settlement proceeds. It is true that by signing the June 26, 2018 consent order reopening this case, the Debtor pledged to submit to the Trustee any non-exempt funds received from settling the 2010 Claim. (Given § 1329's temporal limitations, the Debtor was not required to do even that.) But nowhere in that order did the Debtor consent to turn over any funds from the Malpractice Claim settlement. No such funds then existed—the Malpractice Claim would not arise for another six years. The "malpractice cause of action was unknown, not even rising to a hope; the most pessimistic curmudgeon could not anticipate that, [years] later, [the

---

in the case. Now, if you wanted to treat creditors more adversely than they had been treated in a plan, clearly you've got to have a modification. If you wanted to deal with the debtors' property or property of the estate, which may or may not have vested in the debtors, in a matter that might be contrary to the debtors' personal interest and without their consent, you would have to have a modification . . . . [But] it seems to me that if debtors come into money, from an inheritance, from winning the lottery, from a cause of action, from a gift, from whatever source, and the debtors consent to that money being paid through their Chapter 13 plan to unsecured creditors, that doesn't require a modification. The trustee can take those funds and pay them on a pro rata basis up to a hundred percent to the unsecured creditors. So the fact that the plan can't be modified, it seems to me, is not a reason to say that the trustee cannot administer the asset." *Id.* at *4. The district court found the bankruptcy court's "rationale persuasive and reject[ed] [the creditor's] argument that the bankruptcy court ha[d] no authority to administer [a] single cause of action without modifying the previously completed plan." *Id.* at *5. *But see D'Antignac*, 2013 WL 1084214, at *6.

Debtor] would lose his [2010 personal injury] claim due to his attorney's malpractice." *Witko*, 374 F.3d at 1044. And the Debtor, through his Motion to Exclude Malpractice Claim that is now before the Court, has unequivocally expressed his *lack* of consent to turning over those funds to the estate. Effectively, he has drawn a line in the sand and said "my generosity ends there." The Court has no authority to order otherwise.

In sum, whether the Malpractice Claim settlement proceeds are estate property under the *Segal* test, or under some other theory, is immaterial. The plan can no longer be modified, and the Debtor has not consented to turn over the proceeds. The Trustee therefore has no means of administering that asset, and the Debtor is at liberty to put the disputed $41,000.00 toward his fresh start.[80]

---

[80] This case does not require the Court to decide whether personal injury settlement proceeds are a "windfall" to the debtor. *See McKinney*, 567 B.R. at 385 (referring to car accident settlement proceeds as a "post-confirmation windfall"). At least one bankruptcy judge has held that they are not. In *In re Hill*, 652 B.R. 212 (Bankr. S.D. Ala. 2023), the debtors in two separate cases were injured while shopping. The bankruptcy court denied the trustee's motions to modify their plans, explaining that "post[-]petition personal injury claims [are] categorically different from other types of post[-]petition assets like lottery winnings, inheritances, or non-spousal life insurance proceeds which might be more appropriately considered 'windfalls' that increase a debtor's ability to pay creditors." *Id.* at 224. In that court's view, "the injured debtor has given consideration in the form of his or her injury" or, more bluntly, has "'earned' the settlement through his or her pain and suffering." *Id.* On appeal, the district court rejected the bankruptcy court's "novel conclusion that the settlement proceeds [were] not new assets and [were] instead consideration" but affirmed the bankruptcy court's ruling that plan modification was not warranted. *Conte v. Hill*, No. 23-00221-KD-N, No. 23-00219-KD-N, 2024 WL 140247, at *8 (S.D. Ala. Jan. 12, 2024).

## IV. Conclusion

Unless a Chapter 13 debtor receives a new post-confirmation asset under § 1306(a) during the plan's commitment period—as may be modified under § 1329(c)—the trustee cannot distribute to creditors the proceeds of that asset absent the debtor's consent. This rule is a necessary consequence of *Waldron* and § 1329. Although the Bankruptcy Code may permit a generous debtor to bypass § 1329 by consenting to share the proceeds with creditors, nothing requires a debtor to do so.

The Court recognizes that this rule is rigid. Consider, for example, a Chapter 13 debtor who obtains a cause of action in the 59th month of a 60-month plan. Under *Waldron*, that cause of action is property of the estate. But litigation may take years before producing a settlement, at which time the trustee would no longer be able to administer that asset through plan modification due to the time limits of § 1329. Worse, an unscrupulous debtor could manipulate the date on which a post-confirmation cause of action is resolved, waiting until the clock runs out to put the settlement funds beyond the trustee's reach.

Fortunately, the Court need not confront here the dilemma posed by such an unscrupulous debtor. At bottom, this case is about a debtor who fulfilled his end of the Chapter 13 bargain. He committed all his disposable income to repaying his creditors, completed all promised plan payments, and received his discharge. The Court will not now deprive him of the benefit of his bargain by allowing creditors to

share in the proceeds of an asset—the Malpractice Claim—that arose over fourteen years after the petition date and over ten years after entry of discharge. To do otherwise would violate Congress's explicit command that Chapter 13 plans may not extend beyond five years. For these reasons, the Court will enter a separate order granting the Debtor's Motion to Exclude Malpractice Claim.

Dated at Savannah, Georgia, this 2nd day of May, 2025.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia